UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**JUDGE BUCKLO**

UNITED STATES OF AMERICA

v.

ROBERT KRASNOW, SR., and
MONTY McCLELLAN

No. **01CR0022**

Violations: Title 18, United
States Code, 1341, 1962(c),
1963, and Title 26, United
States Code, Section 7206(1)

**FILED**

**DOCKETED DEC 27 2000**

**MAGISTRATE JUDGE ASHMAN**

COUNT ONE
**Mail Fraud: Defendant MONTY McCLELLAN**

JAN 1 0 2001

MICHAEL W. DOBBINS, CLERK
UNITED STATES DISTRICT COURT

The UNITED STATES ATTORNEY charges:

1. At times material herein:

a. Doctors Hospital of Hyde Park, Inc. ("Doctors Hospital"), was a hospital, located at 5800 Stony Island Avenue, Chicago, Illinois. Doctors Hospital was an authorized Medicare and Medicaid provider. Medical Management of America, Inc. provided management services to the hospital. HPCH Partners, L.P. owned the physical hospital facility and leased the property to Doctors Hospital. The Two South Unit was a medical/surgical unit within Doctors Hospital.

b. Defendant MONTY McCLELLAN ("McCLELLAN") was a medical doctor, licensed by the State of Illinois. From in or about August 1993 through July 1994, defendant McCLELLAN worked as a doctor at the hospital. Defendant McCLELLAN was the attending physician on a medical/surgical unit at Doctors Hospital, known as the Two South Unit. Defendant McCLELLAN owned and operated a company known as Comprehensive Medical Care, S.C. From in or about June 1992

through in or about January 1994, defendant McCLELLAN worked as a doctor at the Desnick Eye Center. Defendant McCLELLAN was responsible for performing the history and physicals for patients who were scheduled to have surgery at the Desnick Eye Center.

c. Robert Krasnow, Sr. ("Krasnow"), worked at Doctors Hospital from approximately 1992 through 1998. In approximately 1994, Krasnow became the Vice President and Director of Marketing. Krasnow was responsible for marketing and obtaining patients for the hospital. From at least 1988 through at least 1994, Krasnow provided services to the Desnick Eye Center, a/k/a EyeCare Physicians of America ("Desnick Eye Center"), in Chicago, Illinois, which services included recruiting physicians, marketing, and carrying out various administrative tasks. The Desnick Eye Center was an authorized Medicaid and Medicare provider.

d. Dr. 1 was a medical doctor, licensed by the State of Illinois, who was involved in the operation of Doctors Hospital, and held a financial interest in the hospital. Dr. 1 was also involved in the operation of the Desnick Eye Center and held a financial interest in the Desnick Eye Center.

e. Dr. 2 was a medical doctor, licensed to practice medicine in the State of Illinois. From approximately January 1995 through at least October 1998, Dr. 2's company had service contracts with Doctors Hospital relating to anesthesia services. From approximately October, 1995 until approximately July 1997, Dr.

2

2 provided anesthesia services at the Desnick Eye Center and its successor.

f.    Individual 1 was a physician's assistant who worked on the Two South Unit with defendant McCLELLAN.  Individual 1 also worked at the Desnick Eye Center with defendant McCLELLAN.

g.    There were also certain individuals, including Individual 2 and Individual 3, who were paid kickbacks and other remuneration to recruit patients for admission to Doctors Hospital.

h.    Medicare was a national health insurance program pursuant to Title 18 of the Social Security Act.  The Health Care Financing Administration ("HCFA") was a federal agency within the United States Department of Health and Human Services ("HHS"), which administered the Medicare program through its contractors. Medicare provided free or below-cost health care benefits to certain eligible beneficiaries, primarily persons who were sixty-five years of age and older.

i. Medicare Part A helped pay for medically necessary inpatient hospital care, including medically necessary testing. Medicare Part B helped pay for certain medically necessary physician services, outpatient services, and other medical services.

j.    The Health Care Service Corporation was a private health insurance carrier which contracted with HCFA to process Medicare claims in Illinois and make payments for covered services.

3

k. Medicaid was a medical assistance program pursuant to Title 19 of the Social Security Act. In Illinois, Medicaid was administered by the Illinois Department of Public Aid ("IDPA"). Medicaid provided free or below-cost health care benefits, including hospitalization, physician visits and prescription drugs, to certain eligible beneficiaries, primarily low-income individuals. Medicaid in Illinois was funded in part by IDPA and in part by HHS. Medicaid reimbursed participating physicians who provided medically necessary examinations and procedures to eligible beneficiaries.

l. Medicare and Medicaid authorized payment for standard physician and hospital services, only if those services were "medically necessary", namely services required because of disease, disability, infirmity, or impairment. Medicare and Medicaid would not pay for services and treatment if the patient did not meet criteria which indicated that the patient needed the relevant services and treatment.

2. Beginning in or about October 1992, and continuing until in or about at least July 1994, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

MONTY McCLELLAN,

defendant herein, together with others known and unknown to the grand jury, devised, intended to devise and participated in a

4

scheme and artifice to defraud, and to obtain money and property by means of materially false and fraudulent pretenses, representations, promises, and omissions, and to deprive patients at the Desnick Eye Center and Doctor's Hospital and others of the intangible right to the defendant's honest services and the honest services of others.

3. It was part of the scheme that while working at Doctors Hospital, defendant McCLELLAN fraudulently ordered that hundreds of patients be admitted to the Two South Unit of Doctors Hospital under the false pretenses that the patients needed cardiac and pulmonary care or other types of medical care, knowing that admission of those patients to the hospital was medically unnecessary. Defendant McCLELLAN also made false entries in medical records at Doctors Hospital and the Desnick Eye Center. Moreover, while working at the Desnick Eye Center defendant McCLELLAN fraudulently ordered unnecessary allergy tests, in exchange for kickbacks. The allergy testing resulted in payments by Medicare exceeding $500,000. Defendant McCLELLAN also made false entries in medical records at the Desnick Eye Center.

### Doctors Hospital: Two South Unit

4. It was further part of the scheme that, from in or about October 1993 through July 1994, defendant McCLELLAN fraudulently ordered that hundreds of patients be admitted to Doctors Hospital, knowing that those patients did not need to be admitted to the

5

hospital for medical reasons and that the admissions were medically unnecessary.

5. It was further part of the scheme that defendant McCLELLAN admitted patients to the Two South Unit of the hospital knowing that the admissions were medically unnecessary because any existing medical problems were not of a nature that required hospitalization. Defendant McCLELLAN admitted patients to the Two South Unit even though the pre-admission medical workups did not support the admissions.

6. It was further part of the scheme that defendant McCLELLAN admitted numerous patients to the Two South Unit for chest pain, even though the patients were not experiencing chest pain at or near the time he admitted them. Defendant McCLELLAN failed to document when the patients had allegedly experienced chest pain. Defendant McCLELLAN also admitted certain patients to the hospital for chest pains, even though pre-admission medical workups did not support the admissions.

7. It was further part of the scheme that defendant McCLELLAN knew that other hospital employees told patients that there were no drug rehabilitation beds available, but that the patients could be admitted to the hospital if they stated that they had medical problems such as chest pains, stomach pains, and respiratory problems. In fact, the defendant knew that the patients wanted to be admitted to the hospital in order to obtain food and shelter,

6

and in some cases drug detoxification treatment.

8. It was further part of the scheme that defendant McCLELLAN admitted patients to the Two South Unit for medical problems rather than drug detoxification treatment because the defendant knew that Medicaid and private medical insurance plans, would not reimburse the hospital for detoxification admissions since those patients did not meet the established criteria for admission.

9. It was further part of the scheme that defendant McCLELLAN made and caused others to make false entries in the medical records of patients in the Two South Unit. Defendant McCLELLAN and Individual 1, a physician's assistant, often made changes and additions to patients' charts without initialing or accurately dating the changes. Defendant McCLELLAN altered, and caused Individual 1 to alter the lab order forms in certain charts to make it appear that appropriate tests and procedures had been ordered, when in fact those tests and procedures had not been ordered. Defendant McCLELLAN also routinely backdated the date of his review of certain Discharge Summaries.

10. It was further part of the scheme that defendant McCLELLAN discharged and caused others to discharge patients after a certain period of time so that the hospital would not lose money by continuing to allow the patient to stay in the hospital.

7

## Desnick Eye Center:   Fraudulent Allergy Testing

11.   It was further part of the scheme that while working at the Desnick Eye Center defendant McCLELLAN ordered hundreds of unnecessary allergy tests for patients who were at the Desnick Eye Center for eye surgery, knowing that those tests were not medically necessary or justified based on the patients' physical condition.

12.   It was further part of the scheme that during 1992 and 1993, Krasnow, acting in concert with Dr. 1, paid defendant McCLELLAN thousands of dollars in cash kickbacks so that defendant McCLELLAN would order allergy tests for patients at the Desnick Eye Center.  In exchange for the kickbacks, defendant McCLELLAN ordered hundreds of  allergy tests, without regard to the medical necessity of those tests.

13.   It was further part of the scheme that the owner of a laboratory paid Krasnow kickbacks so that Krasnow would arrange to have defendant McCLELLAN order allergy tests.  The laboratory was able to obtain more than $500,000 in payments from Medicare as a result of the allergy tests ordered by defendant McCLELLAN.  Dr. 1 allowed the laboratory owner to pay Krasnow kickbacks in exchange for the allergy testing at the Desnick Eye Center so that Dr. 1 would not have to pay Krasnow a salary or fees for the services that Krasnow provided to Dr. 1 and the Desnick Eye Center.

14.   It was further part of the scheme that defendant McCLELLAN ordered the allergy tests (radioallergosobent allergy

8

tests known as "RAST" allergy tests) even though the patients did not have symptoms or complaints that justified, supported, or required ordering RAST allergy tests. Defendant McCLELLAN fraudulently wrote certain information in the patient's medical records in order to justify ordering the allergy tests. The defendant recorded a diagnosis but failed to record any patient complaints or symptoms.

15. It was further part of the scheme that defendant McCLELLAN ordered two or three RAST allergy tests for some patients, because the patients' medical records did not include information showing that the patients had already had allergy tests performed.

16. It was further part of the scheme that defendant McCLELLAN and other representatives of the Desnick Eye Center failed to advise many of the patients of the results of the RAST allergy tests. The defendant and other representatives of the Desnick Eye Center also failed to provide or arrange for any follow-up treatment after receiving the allergy test results.

### Desnick Eye Center: False Entries in the H & P Forms

17. It was further part of the scheme that defendant McCLELLAN made and caused others to make false entries in medical records at the Desnick Eye Center, including the following:

a. In order to conceal the amount of time that elapsed between the time that the history and physical was performed

9

and time that surgery was started, defendant McCLELLAN did not record the time at which he performed the patients' history and physicals ("H&Ps"), leaving that space in the medical chart blank, so that someone else could subsequently fill in the time;

b.  Defendant McCLELLAN initialed numerous history and physical forms that were filled out by Individual 1, the physician's assistant, but did so months after the history and physicals had been performed, thereby creating the false appearance that the defendant had been supervising Individual 1, when in fact he had not.  Individual 1 also went through those charts with the defendant and, with the defendant's knowledge and consent, signed the defendant's initials to many of the charts, even though the defendant did not review those charts; and

c.  Defendant McCLELLAN cleared certain patients for surgery, even though, on some occasions, the results of certain blood and urinalysis tests for those patients had not been completed or reviewed prior to surgery.  Those lab results were added to the patients' medical charts after the surgery had been performed and the defendant signed off on the lab results.

### Concealment

18.  It was further part of the scheme that the defendant did

misrepresent, conceal, hide and cause to be misrepresented, concealed and hidden the purposes of and acts done in furtherance of the fraud scheme.

## Mailing

19. On or about October 7, 1993, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere,

MONTY McCLELLAN,

defendant herein, for the purpose of executing the above-described scheme, and attempting so to do, did knowingly cause to be delivered by mail, according to the directions thereon, an envelope containing a check from the Health Care Service Corporation, which included the amount of approximately $446 in payment for an allergy test that had been ordered by the defendant, which check was made payable to a medical laboratory, and the envelope was addressed to that laboratory in Chicago, Illinois;

In violation of Title 18, United States Code, Section 1341.

11

## COUNT TWO
### Racketeering: Defendant KRASNOW

The UNITED STATES ATTORNEY further charges:

1. Paragraph 1 of Count One of this information is realleged and incorporated as though fully set forth herein.

### The Enterprise

2. At times material herein:

a. Defendant KRASNOW, and Doctors Hospital, Medical Management of America, Inc., HPCH Partners, L.P., Dr. Monty McClellan, Dr. 1, Dr. 2, Individuals 1, 2 and 3, and others were members and associates of an enterprise, that is, an association in fact of the above named corporations, partnership, and individuals.

b. The enterprise engaged in interstate commerce, and its activities affected interstate commerce.

### Purposes of the Enterprise

3. The purposes of the enterprise included the following:

a. Enriching the members and associates of the enterprise through, among other things, mail fraud and wire fraud.

b. Promoting and enhancing the enterprise and its members' and associates' activities.

c. Concealing the nature and origin of the proceeds of the frauds perpetrated by the enterprise.

### Means and Methods of the Enterprise

4. Among the means and methods by which the defendants and

12

their associates conducted and participated in the conduct of the affairs of the enterprise were the following:

a. Members and associates of the enterprise admitted and caused the admission of numerous individuals as hospital patients, knowing that the individuals did not need to be hospitalized.

b. Members and associates of the enterprise paid others to seek out individuals willing to become hospital patients even though their physical condition did not warrant hospitalization.

c. Members and associates of the enterprise paid doctors and others to recommend patients for hospitalization even though the patients' physical conditions did not require hospitalization.

d. Members and associates of the enterprise prepared and caused others to prepare false records in order to ensure that the patients qualified for Medicare or Medicaid insurance payments.

e. Members and associates of the enterprise submitted and caused others to submit false claims to Medicare and Medicaid, seeking payments for services provided to, and tests performed on, patients who had been admitted to the hospital based on diagnoses that were false or exaggerated.

f. Members and associates of the enterprise received monies from Medicare and Medicaid to cover the costs of treatment and tests, at least in part, for patients whose admissions were medically unnecessary, including for patients whose symptoms and treatment had been falsely stated on claims, and for admissions

13

that resulted from the payment of kickbacks, and other benefits and inducements. The amount derived from these fraudulent admissions was at least $7 million dollars.

5. Beginning in or about July 1993 and continuing until at least December 1998, in the Northern District of Illinois, Eastern Division, and elsewhere,

ROBERT KRASNOW, SR.,

defendant herein, together with others known and unknown to the grand jury, being a person employed by and associated with the enterprise described above, which was engaged in, and the activities of which affected interstate commerce, knowingly, intentionally and unlawfully conducted the affairs of the enterprise, and participated in the conduct of the affairs of the enterprise, directly and indirectly, through a pattern of racketeering activity, as defined in Title 18, United States Code, Section 1961(1) and (5), said pattern of racketeering activity consisting of racketeering acts involving mail fraud (18 U.S.C. § 1341) and wire fraud (18 U.S.C. § 1343), as described below:

## THE MAIL FRAUD AND WIRE FRAUD SCHEME

6. Beginning no later than July 1993, and continuing until at least December 1998, at Chicago, in the Northern District of Illinois, Eastern Division, and elsewhere, defendant KRASNOW, together with Dr. 1, Dr. 2, Dr. McClellan, and Individuals 1, 2, and 3, and others, and Doctors Hospital, acting through its agents,

14

representatives, and employees, devised, intended to devise and participated in a scheme and artifice to defraud Medicare, Medicaid, and private insurers, and to obtain money and property from those entities by means of materially false and fraudulent pretenses, representations, promises, and omissions, which scheme is further described below.

7. It was part of the scheme that defendant KRASNOW, together with Doctors Hospital, acting through its agents, representatives, and employees (hereinafter all references to Doctors Hospital include its agents, representatives, and employees), and Dr. 1, Dr. 2, Dr. McClellan, and Individuals 1, 2, and 3, and others engaged in fraudulent conduct for the purpose of generating substantial revenues from Medicare, Medicaid, and private insurers, which included the following:

a. Giving and causing others to give kickbacks, incentives and benefits to certain doctors and other individuals in order to induce them to refer and admit patients to Doctors Hospital;

b. Causing patients to be admitted to Doctors Hospital by giving the patients cash or other benefits, by coaching patients to lie about their physical condition, by promising that the hospital stay would cost the patients nothing, and by telling certain patients that they needed to be hospitalized, even when there was no such need;

c. Admitting and treating and causing others to admit and treat certain patients even though the patients did not have existing medical problems that required or justified such hospitalization or treatment;

d. Concealing and attempting to conceal the scheme by creating false, fraudulent, and fictitious medical, clinical and business records; and

e. Submitting and causing others to submit fraudulent bills to Medicare, Medicaid and other health care insurers, which included charges based on false diagnoses and for medically unnecessary services and tests. In total this scheme caused a loss to Medicare, Medicaid and private insurers of more than $7 million.

### Money, Contracts, and Other Benefits

8. It was further part of the scheme that defendant KRASNOW, Dr. 1, Dr. 2, and Doctors Hospital, gave and caused others to give certain doctors and patient recruiters cash, checks, contracts, and other incentives and benefits in exchange for patient admissions, including the following:

a. Defendant KRASNOW, Dr. 1, and Doctors Hospital provided and caused others to provide service contracts to certain doctors and individuals, including Dr. McClellan and Dr. 2, in order to pay for patient admissions, thereby creating the false appearance that certain doctors and

individuals were being paid for legitimate services, when in fact those individuals were being paid for the admission of patients. Certain doctors and other individuals signed false and fraudulent time sheets and logs in order to make it appear that the doctors were providing services under their contracts;

b. Defendant KRASNOW gave Dr. 2 more than $100,000 in cash; most of that cash was provided by Dr. 1, so that defendant KRASNOW could give it to Dr. 2;

c. In or about June 1997, Doctors Hospital entered into a contract with Dr. 2's company, and paid that company approximately $16,666 each month so that Dr. 2 could pay patient recruiters and patients. The contract was designed to conceal the fact that those monies were being paid in exchange for patient admissions;

d. Doctors Hospital allowed Dr. 2 to act as the head of the Anesthesia Department of Doctors Hospital, in exchange for providing a substantial number of patient admissions each year;

e. Dr. 2 gave money and other benefits to various patient recruiters and doctors in exchange for their referring or admitting patients. Dr. 2 paid Individual 2 approximately $400 - $500 for each patient admission;

17

f.    Defendant KRASNOW paid Individual 3 for patient admissions.

g.   Doctors Hospital arranged for and allowed certain doctors, including Dr. McClellan, to act as the attending physicians for patients admitted as part of this scheme, and to obtain payments from insurers, including Medicare and Medicaid, in connection with those patients; and

h.   Doctors Hospital and Dr. 1 gave defendant KRASNOW and others substantial salaries, bonuses, and loans so that those individuals would continue to participate in this scheme.

### Recruiting Patients

9.   It was further part of the scheme that Doctors Hospital, defendant KRASNOW, together with Dr. 1, Dr. 2, Individuals 2 and 3, and others recruited patients, many of whom were homeless, or were substance abusers and wanted food and shelter or detoxification treatment, and obtained patients for admission by:

a. Giving some patients cash and other things of value such as cigarettes, in order to induce them to be admitted to the hospital;

b.  Coaching people to say that they had certain symptoms which would justify hospital admissions, even though the individuals did not actually have those symptoms;

c.  Promising certain patients that the hospital stay would be free, in that the hospital would waive co-payments

18

due from the patients, and would accept payments by insurers as payment in full, without additional payments from the patients; and

d. Falsely representing to certain patients that they needed to be hospitalized because of certain medical problems, when, in fact, the patients did not need to be hospitalized.

### Medically Unnecessary Admissions

10. It was further part of the scheme that defendant KRASNOW, together with Dr. 1, Dr. 2, Dr. McClellan, Individuals 1, 2, and 3, Doctors Hospital and others caused patients who did not need to be hospitalized to be admitted to Doctors Hospital, knowing that those admissions were medically unnecessary, and in connection with these medically unnecessary admissions:

a. Invented and reported, and caused others to invent and report, fictitious or exaggerated diagnoses, often relating to chest pains, stomach pains, or respiratory problems;

b. Caused certain patients to be admitted into Doctors Hospital without having been examined or diagnosed by a doctor prior to admission;

c. Provided and ordered services and tests, and caused others to provide and order services and tests for those patients whose admissions were medically unnecessary, and caused bills to be submitted to Medicare, Medicaid, and

19

private insurers for those services and tests;

d. During January and February 1997, Doctors Hospital admitted at least 5 healthy individuals, who were acting in an undercover capacity, posing as patients, using the names Paul Alexander, Howard Matthews, Anthony Giorlando (two admissions), Miguel Acosta, and Miguel Flores, who did not need to be hospitalized. Dr. 2 caused those patients to be admitted, knowing that the patients were healthy and the admissions were medically unnecessary; and

## False and Fraudulent Records

11. It was further part of the scheme that defendant KRASNOW, Dr. 1, Dr. 2, Dr. McClellan, Individual 1, Doctors Hospital and others, created, and caused others to create, false, fictitious and fraudulent clinical, medical and business records, and included the following:

a. The defendant and others prepared and caused the preparation of false records in order to create the false appearance that the admission and treatment of certain patients was medically necessary, and in order to increase payments from insurers for certain patients;

b. Dr. McClellan and Individual 1 made false entries in medical records, created false diagnoses, backdated documents, and altered lab order forms to make it appear that appropriate tests and procedures had been ordered, when in fact those

20

tests and procedures had not been ordered;

c. Other doctors and individuals made false entries in medical charts, including false diagnoses, and falsely documenting patients' complaints and symptoms; and

d. Doctors Hospital sent bills to certain patients in order to make it appear that the hospital had attempted to collect monies owed by those patients, including insurance co-payments and deductibles, when in fact no payments were expected, because Doctors Hospital had promised that the patients would not have to pay anything for services and treatments they received during their hospital admissions.

### Concealment

12. It was further part of the scheme that defendant KRASNOW, Dr. 1, Dr. 2, Dr. McClellan, Doctors Hospital, and others did misrepresent, conceal, hide and cause to be misrepresented, concealed and hidden the purposes of and acts done in furtherance of this fraud scheme.

### THE PATTERN OF RACKETEERING

### RACKETEERING ACT ONE
### Mail Fraud: Medicaid and Medicare Payments to Dr. McClellan

13. On or about the dates set forth below, defendant KRASNOW committed the acts of mail fraud identified below, in violation of 18 U.S.C. § 1341, for the purpose of executing the scheme set forth in Paragraphs 6 through 12 of this information, by knowingly causing to be delivered by mail, on or about the dates identified below, according to the directions thereon, envelopes, each

21

envelope containing a check issued by the Comptroller's Office for the State of Illinois, in the approximate amount set forth below, which envelopes were addressed to Dr. McClellan's company, Comprehensive Medical Care, SC, in Wadsworth, Illinois, and, for Racketeering Acts 1Q and 1R, each envelope containing a check issued by the Health Care Service Corporation, in the approximate amount set forth below, which envelopes were addressed to Dr. McClellan, in Wadsworth, Illinois, any one of which alone constitutes the commission of Racketeering Act One:

| ACT | DATE | AMOUNT OF THE CHECK |
|-----|------|---------------------|
| 1A | 4/27/94 | $7,019 |
| 1B | 4/28/94 | $3,851 |
| 1C | 5/5/94 | $4,862 |
| 1D | 5/12/94 | $6,027 |
| 1E | 6/9/94 | $3,227 |
| 1F | 6/14/94 | $1,582 |
| 1G | 6/15/94 | $5,633 |
| 1H | 6/16/94 | $7,424 |
| 1J | 6/20/94 | $1,312 |
| 1I | 6/20/94 | $3,670 |
| 1K | 6/21/94 | $6,209 |
| 1L | 7/28/94 | $4,822 |
| 1M | 8/1/94 | $7,558 |
| 1N | 8/3/94 | $3,865 |
| 1O | 8/5/94 | $2,034 |
| 1P | 8/17/94 | $3,398 |
| 1Q | 6/13/94 | $2,411 |
| 1R | 6/17/94 | $1,275 |

## RACKETEERING ACT TWO
### Mail Fraud: Medicaid Checks Relating to Healthy Patients

14. On or about the dates set forth below, defendant KRASNOW committed the acts of mail fraud identified below, in violation of 18 U.S.C. § 1341, for the purpose of executing the scheme set forth above, by knowingly causing to be delivered by mail, on or about

22

the dates identified below, according to the directions thereon, envelopes, each envelope containing a check issued by the Comptroller's Office for the State of Illinois, in the approximate amount set forth below, relating to the healthy (undercover) patients identified below and those envelopes included the address information specified below, any one of which alone constitutes the commission of Racketeering Act Two:

| ACT | DATE | AMOUNT | ADDRESS | PATIENT |
|-----|------|--------|---------|---------|
| 2A | 3/26/97 | $ 978 | Roosevelt Rd., Broadview, IL | Miguel Flores |
| 2B | 3/31/97 | $8,979 | S. Rte. 31, McHenry, IL | Miguel Flores |
| 2C | 4/25/97 | $3,671 | Spinning Wheel, Hinsdale, IL | Miguel Flores |
| 2D | 4/28/97 | $ 630 | S. 78th Ave., Tinley Park, IL | Miguel Acosta |

### RACKETEERING ACTS THREE(a) and THREE(b)
**Wire Fraud: Medicare Payments Relating to Healthy Patients**

15(a). On or about the dates set forth below, defendant KRASNOW committed the acts of wire fraud identified below, in violation of 18 U.S.C. § 1343, for the purpose of executing the scheme set forth above, by knowingly causing to be transmitted in interstate commerce from Richmond, Virginia, to Chicago, Illinois by means of wire and radio communications, certain signs, signals and sounds, namely: the electronic wire transfer of funds, which included payment to Doctors Hospital relating to the healthy (undercover) patients listed below, in approximately the amounts listed below, any one of which alone constitutes the commission of Racketeering Act Three:

| ACT | DATE | PATIENT | AMOUNT |
|-----|------|---------|--------|
| 3A | 2/12/97 | Paul Alexander, Jr. | $4,428 |
| 3B | 2/18/97 | Howard Matthews | $5,727 |

23

| | | | |
|---|---|---|---|
| 3C | 2/26/97 | Anthony Giorlando | $4,546 |

**Wire Fraud: Claims Sent to Medicare Concerning Healthy Patients**

15(b).  On or about the dates set forth below, defendant KRASNOW committed the acts of wire fraud identified below, in violation of 18 U.S.C. § 1343, for the purpose of executing the scheme set forth above by knowingly causing to be transmitted in interstate commerce from Chicago, Illinois, to Florida by means of wire and radio communications, certain signs, signals and sounds, namely:  electronic claims information relating to the healthy (undercover) patients listed below, submitted by Doctors Hospital, which information was forwarded to Florida for review as part of the Medicare claims processing procedure, any one of which alone constitutes the commission of Racketeering Act Three:

| ACT | DATE | PATIENT |
|---|---|---|
| 3D | 1/28/97 | Paul Alexander, Jr. |
| 3E | 1/30/97 | Howard Matthews |
| 3F | 1/30/97 | Anthony Giorlando |
| 3G | 2/13/97 | Anthony Giorlando |

All in violation of Title 18, United States Code, Sections 1962(c) and 2.

## COUNT THREE
### Tax Fraud (1993): Defendant ROBERT KRASNOW

The UNITED STATES ATTORNEY further charges:

1.  Paragraph 1 of Count One of this information is realleged and incorporated as though fully set forth herein.

2.  On or about October 20, 1994, in the Northern District of Illinois, Eastern Division,

ROBERT KRASNOW, SR.,

defendant herein, a resident of Northbrook, Illinois, who during calendar year 1993 was married, willfully did make and subscribe, and cause to be made and subscribed, a joint United States Individual Income Tax Return (Form 1040) for the calendar year 1993, on behalf of himself and his wife, which return was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, and which return he did not believe to be true and correct as to every material matter, in that the return stated on Line 23 (Total Income) that their total income was $159,944, whereas in truth and in fact, as the defendant well knew and believed, in the calendar year of 1993, he had received additional income of at least $66,000 as kickbacks from medical laboratories;

In violation of Title 26, United States Code, Section 7206(1).

25

**COUNT FOUR**
**Tax Fraud (1994): Defendant ROBERT KRASNOW**

The UNITED STATES ATTORNEY further charges:

1.    Paragraph 1 of Count One of this information is realleged and incorporated as though fully set forth herein.

2.    On or about October 18, 1995, in the Northern District of Illinois, Eastern Division,

ROBERT KRASNOW, SR.,

defendant herein, a resident of Northbrook, Illinois, who during calendar year 1994 was married, willfully did make and subscribe, and cause to be made and subscribed, a joint United States Individual Income Tax Return (Form 1040) for the calendar year 1994, on behalf of himself and his wife, which return was verified by a written declaration that it was made under the penalties of perjury and was filed with the Internal Revenue Service, and which return he did not believe to be true and correct as to every material matter, in that the return stated on Line 22 (Total Income) that their total income was $710,443, whereas in truth and in fact, as the defendant well knew and believed, in the calendar year of 1994, he had received additional income of at least $12,000 as kickbacks from a medical laboratory;

In violation of Title 26, United States Code, Section 7206(1).

26

## FORFEITURE ALLEGATION

The UNITED STATES ATTORNEY further charges:

1. The allegations contained in Count 2 of this information are hereby realleged and incorporated by reference for the purpose of alleging forfeitures pursuant to the provisions of Title 18, United States Code, Section 1963.

2. Defendant KRASNOW acquired and maintained property interests constituting, and derived from, proceeds which the defendants obtained, directly and indirectly, from racketeering activity in violation of Title 18, United States Code, Section 1962, as set forth in Count 2 of this information, thereby making all such property subject to forfeiture to the United States of America pursuant to Title 18, United States Code, Section 1963.

3. The United States seeks to forfeit the interests of the defendants in the following assets:

   a. Approximately $3,000,000 and all proceeds
      traceable thereto.

4. To the extent that the proceeds described above as being subject to forfeiture pursuant to Title 18, United States Code, Section 1963, as a result of any act or omission of the defendants:

   a. cannot be located upon the exercise of due diligence;

   b. have been transferred to, sold to, or deposited with
      a third person;

   c. have been placed beyond the jurisdiction of the court;

   d. have been substantially diminished in value, or

e. have been commingled with other property that cannot be subdivided without difficulty;

it is the intent of the United States, pursuant to Title 18, United States Code, Section 1963(m) to seek forfeiture of any other property of said defendants up to the value of the said property listed above as being subject to forfeiture.

All pursuant to Title 18, United States Code, Section 1963.


UNITED STATES ATTORNEY