Case: 1:01-cr-00022 Document #: 72 Filed: 05/05/04 Page 1 of 22 PageID #:228

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**



| | |
|---|---|
| **UNITED STATES OF AMERICA** | ) |
| | ) |
| v | ) **No 01-CR-22-1** |
| | ) |
| **ROBERT KRASNOW** | )**Honorable Elaine E. Bucklo,** |
| | )**Judge Presiding** |
| | ) |
| Defendant, | ) |
| | ) |

## DEFENDANT KRASNOW'S MEMORANDUM IN SUPPORT OF THREE LEVEL DOWNWARD ADJUSTMENT FOR ACCEPTANCE OF RESPONSIBILITY

### I. INTRODUCTION

On January 10, 2001, a four count Information was filed in this case against Robert Krasnow Sr. and Monty McClellan.

Three weeks later, on February 2, 2001, Mr., Krasnow appeared before this Honorable Court, waived indictment and plead guilty to counts two and three of the Information. Those counts concerned a mail fraud and wire fraud scheme occurring between July 1993 and December 1998.

Guideline Section 3E1.1 sets forth the criteria for an individual's receipt of a decrease in his offense level for acceptance of responsibility.[1] The Pre-Sentence Report in this case proposes a three level adjustment for acceptance of responsibility based on

---

[1] The November 1995 addition of the guideline manual has been used in this case. (See PSR Page 11, Lines 346-348)

the fact that Mr. Krasnow "entered a plea of guilty to counts two and three..."; "stipulated to additional relevant conduct..."; "...verbally acknowledged his participation in the offense,"; "indicated how sorry he was for what he did, and stated that he would never do anything like this again"; and "according to the government...entered a plea of guilty in a timely manner, thereby allowing the government to use its resources efficiently." (See PSR at Page 11 Lines 336-342)    For these reasons as well as those more fully set forth below, the Probation Department's proposal should be accepted.

## II. TIMELINESS; APPLICATION NOTE 1(h)

Application Note 1(h) of the Commentary to this provision provides "the timeliness of the defendant's conduct in manifesting the acceptance of responsibility" as an appropriate consideration in qualifying for this reduction.

Although first charged in this matter in January 2001, Mr. Krasnow began cooperating with the Government at the end of 1998.  His first face-to-face proffer session occurred on January 11, 1999, a full two years before Mr. Krasnow was ever officially charged.  That debriefing occurred in the offices of the United States Attorney in the presence of Special Agent James Ferguson, Postal Inspector D.J. Leonhardt, Assistant United States Attorney, Jacquelin Stern, and the undersigned.  This proffer concerned information and leads provided by Mr. Krasnow to the Government on the topic of Doctors Hospital of Hyde Park and fraudulent conduct undertaken by several of the then principals of that hospital, including several physicians and administrators.  This

same proffer session proceeded for approximately two hours, concluding with the understanding that Mr. Krasnow would continue to cooperate with the Government. Indeed, Mr. Krasnow's cooperation continued from month to month over the course of the ensuing two years until he was charged.

Thereafter, Mr. Krasnow continued to work with Government prosecutors and investigators in both Chicago and Miami. He was identified by the Government as an available witness in a number of criminal matters, which resulted in guilty pleas. He remains a witness for the Government in an ongoing investigation in Florida. After a lengthy debriefing towards the end of last year, on November 7, 2003, the case agent for the FBI, Special Agent Wayne Russell, stated this to the undersigned concerning the value of Mr. Krasnow's efforts: "Bob put the whole thing together for me; without him, we wouldn't have a case and wouldn't be recovering anything from anyone." In the Florida case, like the Chicago case, a component of Mr. Krasnow's cooperation involved working undercover. Specifically, Mr. Krasnow wore a wire and recorded telephone conversations, which not only aided in the investigation of Doctors Hospital in this case, but in the related investigations of fraud at Edgewater Hospital in Chicago and Larkin Hospital in Miami. Individuals confronted with the evidence of their own wrongdoing, based on these undercover efforts by Mr. Krasnow, have themselves become Government witnesses, aiding in the investigations.

### III. TRUTHFUL ADMISSIONS; APPLICATION NOTE 1(a)

Application Note 1(a) provides that the determination of whether an individual qualifies for a downward adjustment for acceptance of responsibility for his offense also includes: "truthfully admitting the conduct comprising the offenses of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable...Note that a defendant is not required to volunteer or affirmatively admit relevant conduct beyond the offense of conviction in order to obtain a reduction...A defendant may remain silent in respect to relevant conduct beyond the offense of conviction without affecting his ability to obtain a reduction under this subsection...."

The Government's Version of Events provides brief summary of the extensive information involved in Mr. Krasnow's truthful admissions to the Government, comprising not only his two counts of conviction but additional relevant conduct specified in his plea agreement. In the Government's words, "defendant provided a substantial amount of information to the Government, outlining his criminal conduct and the criminal conduct of numerous other people. The Government has been able to corroborate many of the facts provided by Krasnow. Mr. Krasnow met with the investigative agents dozens of times." In fact, Mr. Krasnow, in addition to his meeting on January 11, 1999, met with Chicago prosecutors and/or agents on February 8, 1999, February 16, 1999, March 4, 1999, March 12, 1999, March 13, 1999, March 31, 1999, April 5, 1999, May 18, 1999, August 18, 1999, August 25, 1999, November 11, 1999,

February 29, 2000, January 31, 2001, February 1, 2001, and July 12, 2001.[2]  One of the participants for the Government was moved to observe after the debriefing process that the information "seemed to just pour out of him." Mr. Krasnow genuinely believed that in cooperating, he was truly doing the right thing not only for himself, but for all concerned.

Additionally, Mr. Krasnow met with Florida prosecutors and/or case agents on March 6, 2000, March 29, 2000, April 25, 2000, May 25, 2000, July 25, 2000, and September 7, 2000.[3]  Sometime thereafter, the Department of Justice assumed responsibility for the Florida investigation, the transition occurring in approximately early 2003. Mr. Krasnow again began the lengthy process of protracted debriefings, including an extensive debriefing on June 13, 2003 and again on November 7, 2003. Mr. Krasnow, together with other witnesses he has provided, remain vital even now to the Government's ongoing investigation in Florida. Mr. Krasnow did not choose to remain silent in respect to this relevant conduct. To the contrary, he volunteered it. Without Mr. Krasnow's truthful revelations in Florida, as FBI case agent Wayne Russell so aptly put it, the Government "wouldn't have a case." (See PSR Page 28, 29 Lines 886-888)

The Government's version at Page 14 further reveals that, "Krasnow testified in the Grand Jury pursuant to the terms of a plea agreement." Significantly, the date of that testimony was August 10, 2000, a full six months before Mr. Krasnow's guilty plea was ever made. He had no guarantees at that time that his plea agreement would necessarily

---

[2] The defense will have available as Group Exhibit A copies of the FBI 302 reports from these dates.
[3] The defense will also have available for the Court's consideration the FBI 302 reports and proffer notes generated from the meetings with the Florida investigators and prosecutors as its Group Exhibit B.

be accepted. Nonetheless, he offered 94 pages of detail concerning his own admitted misconduct and his understanding of the misconduct of many, many other individuals and entities. Mr. Krasnow's Grand Jury statement, as lengthy as it was, reflected only some of the information originally imparted to the Government. It was a compilation of nearly two years of work to that date. Mr. Krasnow worked tirelessly with the Federal Prosecutor to prepare that statement to help insure its accuracy. The Government prosecutor acknowledged to the Grand Jury just prior to Mr. Krasnow's testimony, "and you and I together prepared this statement; is that correct? Answer: Yes, Ma'am." (August 10, 2000 Grand Jury testimony on pages 6,7)

Mr. Krasnow's cooperative efforts with the Government have occurred over a four-year period. He has truthfully admitted his own misconduct, timely notified authorities of his intentions to enter a plea of guilty literally years before the actual date, volunteered extensive relevant conduct beyond the offense of conviction, and even helped prepare his own Grand Jury statement by pouring over countless FBI reports with the prosecution to develop one cohesive, near 100 page statement. He received no reimbursement from the Government for all of his of countless trips to Chicago, Miami and points in between. He produced witnesses, documents, and investigative leads. His truthful information was corroborated by follow up investigation. In several areas, he has been deemed indispensable to the Government's success. No one could ask or hope to receive more from any individual.

6

## IV. ASSISTANCE TO AUTHORITIES IN THE RECOVERY OF THE FRUITS
## OF THE OFFENSE; APPLICATION NOTE 1(e)

Application Note 1(e) concerns helping the Government to recover proceeds of the offense. On Page 14 of the Government's version of events, it states: "Krasnow provided information about Dr. #1. Dr. #1 subsequently paid $14 million dollars in a civil settlement, in part because of Krasnow's cooperation." The Pre-Sentence Report identifies Dr. #1 as occupying the apex of this scheme. Mr. Krasnow has been characterized by one of the government's agents as a "bagman" for Dr. #1. In the numerous debriefings in this case, Mr. Krasnow identified with painstaking particularity Dr. #1's extensive role in this scheme. Dr. #1 became well aware of the fact of Mr. Krasnow's cooperation. Dr. #1 further knew that Mr. Krasnow was prepared to testify against him and fully realized the impact Krasnow's testimony against him could have. It is therefore accurate to say that the $14 million dollar recovery of criminal proceeds from Dr. #1 was due, in no small part, to Mr. Krasnow's assistance to authorities. Given that the loss calculations, including relevant conduct, is between $10 Million and $20 million dollars, $14 million dollar is no small recover in this context. (See PSR Page 11, lines 358-361)

The Government's official version additionally acknowledges that, "Krasnow also provided information to FBI agents in Florida concerning Larkin Hospital and other health care providers." Indeed, for some years now, the Government has pursued both criminal and civil investigations, seeking to recover fraud proceeds from these other health care providers. We have already detailed the extent to which Mr. Krasnow's

ongoing assistance to authorities has produced tangible results in Florida. Because these efforts are ongoing, no final tally may be provided at this point. However, it bears repeating that, in the estimation of the Florida authorities, without Mr. Krasnow's efforts, they would have no case, much less be able to recover anything from anyone.

In light of these extraordinary efforts on Mr. Krasnow's part, it is an especially cruel irony that the Government now intends to object to the acceptance reduction based on his non-payment of the balance of the forfeiture amount.

Mr., Krasnow does not dispute that he has been unable to pay all of his forfeiture obligation under paragraph 23 of the plea agreement. He has, in fact, paid to the Government $810,000 of the $3 million dollar amount. With the assistance of other family members, he intends to improve on those efforts. The Government's letter dated April 5, 2004, announcing its intention not to make a motion for downward departure and to object to the sentence reduction, does so based on the erroneous assumption that Mr. Krasnow has simply chosen not to pay the whole amount. As such, the dispute between the parties instead centers upon whether Mr. Krasnow has been willful in his non-payments.

From the very beginning of the plea negotiations, Mr. Krasnow expressed grave concerns over his ability to come up with $3 million dollars. He expressed those concerns to the Government. Mr. Krasnow did have some savings. Two of his four children had started businesses, including a production company, an insurance company,

8

an automobile dealership and a small rural hospital in Northern Florida. Mr. Krasnow believed that with the assistance of his family, he had a fighting chance to meet his forfeiture obligation if it was spread out over a lengthy period of time and was based on graduated payments.

The car dealership owned by his oldest daughter is located in Lake City, Florida, calling itself the North Florida Auto Mall. When first opened, there were great expectations that it would generate significant profits, perhaps in excess of $50,000 per month. Mr. Krasnow was to work there in marketing. As reflected in the Pre-Sentence Report on Page 21, Mr. Krasnow began working at the auto mall in September of 2001, continuing for a three-month period into December 2001. In those opening months, the dealership appeared to be heading in a very profitable direction. However, Mr. Krasnow's health problems prevented his continued involvement there.

As reported to the Court in previous motions, each of these businesses has suffered devastating financial downturns. The Government has been specifically advised that the Lake City Auto Mall has lost its franchise, lost its financing, and ultimately lost its ability to continue to operate. In the process, it has tens of thousands of dollars in civil judgments against it. Despite high hopes and everyone's best efforts, the Lake City Auto Mall generates no income and is nothing but a shell of its former self.[4] We understand an investigator sent out by the government has had a first hand opportunity to observe and confirm this.

---

[1] Attached to this memorandum as Exhibit C is a brief article from the Local Lake City Reporter summarizing the demise of this business

The production company, also once located in Lake City, was to do advertising for local businesses. An investment was made into the kind of recording equipment necessary to produce radio and T.V. ads. Mr. Krasnow's oldest daughter was to manage this operation. It, like the auto mall, failed. It never turned a profit. Again, it was hoped that Mr. Krasnow could utilize his marketing abilities to generate business. Again, his health concerns impaired his ability to succeed.

The insurance company, Partners Insurance, was also located in North Florida. It was never intended that Mr. Krasnow would have any involvement in this insurance business, again owned by his daughter. This business, like the car dealership and the production company, failed after Mr. Krasnow's daughter suffered postpartum medical complications. The doors to this business closed earlier this year. It too generated no profit.

The final business, Trinity Community Hospital, is owned and operated by Mr. Krasnow's oldest child, his son Robert Jr. It is an extremely small rural hospital with an outpatient clinic located in Hamilton County, the poorest county in Florida. This hospital has been beleaguered from its inception. It was purchased from a much larger hospital conglomerate that wished to jettison its highly unprofitable appendage. Trinity was forced to sue the seller based on a number of material breaches, which almost forced the new owners out of business. We will furnish to the Court the balance sheet of this hospital. While it generates sufficient monies to pay the majority of its bills, its current

debts greatly outnumber its assets. Over a long period of time, it is expected that this hospital can be profitable. Mr. Krasnow Sr. has never worked there. He neither owns nor controls its operation. The undersigned has first hand knowledge of this, having worked extensively with Robert Jr. in various problems associated with the hospital.

Robert Krasnow Jr. has sought and been turned down for loans based on the inconsistency of the hospital's income and its significant debts.[5] Nonetheless, he continues to be willing to do whatever he can to assist his father.

The principle asset owned by Mr. Krasnow and his wife is their home. It is a lovely home in a wonderful neighborhood in North Florida. As the government has pointed out, Mr. Krasnow intended to sell his home, which had a value of approximately $500,000. Mr. Krasnow first attempted to take out a loan on his home. He was unsuccessful because of his lack of any income due to his health. It did not assist matters that he had to report that he is a convicted felon. Mr. Krasnow turned to a friend of the family who indicated interest in purchasing the house. Approximately $135,000 of the $210,000 paid to the Government by Krasnow between May 20 and July 30, 2003, was generated through this effort. However, for a variety of reasons, that sale fell through. The Government still has the $135,000. Additional efforts at obtaining loans failed until most recently. Karen Krasnow, the defendant's wife was able to obtain a $150,000 loan, despite their lack of income and his conviction. As reflected in attached loan papers, the first approximately $52,000 was devoted to the payment of back real estate taxes and

---

[5] Attached as Group Exhibit D is a copy of a loan denial reflecting this as the basis for the bank's refusal to make the loan

other immediate debts which the lender mandated be paid before any loan could proceed. The balance of that loan, approximately $98,000 is immediately available to the Government towards Mr. Krasnow's forfeiture obligation. Mr. Krasnow's son, Robert, Jr., is willing to buy out the balance of the equity in the home and pay it over to the Government towards his father's forfeiture obligation.

Mr. Krasnow is currently 52 years of age. Although possessing only a 9th grade education, he has worked his whole life. Contrary to his present predicament, it has been an otherwise hard working, law abiding, productive life, in which he and his wife have legitimately accumulated some nice things. Some of the Krasnow's personal property has been sold; other items are presently for sale. Unfortunately, even nice furniture has very little re-sale value compared to its purchase price.

It is true that the government has remained patient throughout much of this process. It is also true, however, that Mr. Krasnow has attempted to do everything in his control to meet his financial obligations. Unfortunately, due to health reasons, Mr. Krasnow's life has become increasingly out of his control. The government simply underestimates the enormity of these health problems and their extremely adverse impact on this individual.

## V. POST OFFENSE REHABILITATIVE EFFORTS; APPLICATION NOTE 1(g)

A further factor identified in the commentary to the guidelines concerns the post-rehabilitative efforts of an individual such as counseling or drug treatment. (See Application Note 1(g) of commentary to 3E1.1) Since at least late 2002, the Government has been advised of Mr. Krasnow's serious mental, emotional and physical problems. It has also been apprised of the psychiatric therapy, psychotropic medications and drug treatment that Mr. Krasnow has sought and received. (See PSR, Pages 19, 20)

The preliminary Pre-Sentence Report was prepared on May 27, 2003. It contains a very lengthy discourse on Mr. Krasnow's difficult childhood, including extensive physical and emotional abuse by his alcoholic father. The report identifies Mr. Krasnow's childhood humiliations prompting him to drop out of high school after the 9th grade and leading him into his own bout with alcoholism.

Dr. Martin M. Steed, a board certified psychiatrist, practicing in Gainesville, Florida, has treated Mr. Krasnow since early April 2002. Dr. Steed submitted an evaluation of Mr. Krasnow referenced in the mental and emotional health portion of the

Pre-Sentence Report (PSR page 19, lines 597-600.)[6] In that evaluation, Dr. Steed established the following psychiatric diagnosis:

1. Post Traumatic Stress Disorder

2. Bi-Polar Affective Disorder Type II currently severely depressed;

3. Opiate dependence with chronic pain; and

4. Alcoholic dependence in remission

In describing Mr. Krasnow's upbringing, Dr. Steed offers the following: "As a child, he suffered physical abuse at the hands of his alcoholic father. The following offers a glimpse of the torture he had to endure. Bob had a problem of bed wetting from ages 3 through 7. His father addressed the problem by beating him (while asleep) when he wet the bed. The beatings grew worse with time, and eventually his father began sleeping with him to catch him in the act...Mr. Krasnow is still not comfortable discussing the details of this period of his life, but I suspect that the terror he learned to expect at night is the reason that he still cannot fall asleep until 5 a.m. when under stress." Thus, quite understandably, the Probation Department describes Mr. Krasnow's upbringing as "difficult".

In the Pre-Sentence Report under the caption Substance Abuse on Page 20, there is reference to communications with Dr. Michael Cromer, a board certified addictionologist, operating an adult recovery unit in Tampa, Florida. In his evaluation

---

[6] The Probation Department and the Government have the complete text of Dr. Steed's evaluation. In the event that Court has not received this evaluation, it will be available to the Court as Defense Group Exhibit E at the May 14th hearing)

dated June 1, 2003, Dr. Cromer diagnosed Mr. Krasnow as suffering from severe chronic opiate dependence.[7] Dr. Cromer also confirms Mr. Krasnow's diagnosis of chronic clinical depression "and a host of additional serious stress disorders, currently being treated with a number of medications." (See PSR Page 19, Lines 615-617)[8] Dr. Cromer further observed that Mr. Krasnow "suffers from a variety of physical maladies, including chronic musculoskeletal pain, coronary artery disease, hypertension, hypercholesterolemia, recurrent pancreatitis, diabetes mellitus, and other medical difficulties." These problems, like his chronic clinical depression, currently require a number of different medications. (See PSR Page 18, Lines 578-586) The recurrent nature of these existing physical conditions, together with the wide variety of medications, has, in Dr. Cromer's view, "required necessary interruptions of our treatment program,…certainly making his drug dependency difficult to conquer."

In reflecting on Mr. Krasnow's history, Dr. Cromer expressed the belief that: "Mr. Krasnow's depression probably began relatively early in his life. He reports drinking a lot in early adolescence, gradually progressing to regular bouts of intoxication. Like his father, Bob also became an alcoholic. He explains the drinking was a way of escaping from all that was bad in his life."

Dr. Cromer's letter explains the etiology of Mr. Krasnow's opiate dependency this way: "Another major development occurred in Bob's life when he was 18. He was

---

[7] Dr. Cromer's evaluation is Defendant's Group Exhibit F and will likewise be made available for the Court's consideration

[8] These psychiatric medications include Wellbutrin SR, and antidepressant, 450 milligrams daily; Remeron, another antidepressant, 45 milligrams at bedtime; Kolnapin for anxiety, 1 to 2 tablets daily; and Ambien, 20 milligrams to help with sleep.

struck by a car while walking across the street. This resulted in severe orthopedic injuries and subsequently a great deal of pain. In particular, his knee was badly damaged and he never allowed it to heal properly. Although apparently never seeking street drugs, Bob turned to painkillers to medicate his physical ailments. The longer he was on these, the easier it was for him to self-medicate the ever growing mental and emotional pain he was in. Bob's dependence on drugs has been ongoing for the better part of 30 years."

The Probation Department, in the course of its investigation, interviewed Mr. Krasnow's wife, Karen. While she described her husband as her "soul mate", she also explained that during the past several years that his case has been pending, he has become a "mere shell of himself". Mrs. Krasnow advised "that in the past two years, he has deteriorated to the point that he spends most of the day in bed, depressed, which is difficult for her to witness" (PSR page 16 lines 510-515)

Consistently, Dr. Cromer writes that Mr. Krasnow "is continually worried and (feeling) guilty over the additional stress that he has brought on his family. He is burdened with the belief that he is personally responsible for any problems experienced by any family member. In a seemingly endless string of ironies, one of Bob's own daughters, Charissa, revealed her own drug dependence problem and called her family for help. Bob abandoned his own treatment program to be at his daughter's side. At the same time, his daughter-in-law, Sharon, began to show serious consequences of drug abuse. She became violent within her home and left Bob and his wife...to care for two young

grandchildren. In addition to spiking intense self-recrimination, these compelling family events have served to further interrupt Bob's desperately needed treatment program."

Mr. Krasnow suffers from an unusual combination of perilous mental and physical illnesses. As he has attempted to detox from his opiate dependence, his alcohol dependence has resurfaced. In an updated letter from Dr. Steed, (dated April 21, 2004 letter appended to this memorandum as Exhibit G) Dr. Steed confirms that Mr. Krasnow has "recently successfully completed outpatient detox for alcohol dependence" while under his care. He further recommends that Mr. Krasnow continue to undergo detoxification for his opiate dependence on an in-patient basis and that "he continue cognitive behavioral therapy for panic disorder."

Robert Krasnow suffers from extreme mental, emotional and physical illness. The stress of his legal difficulties when coupled with what Dr. Steed characterizes as "his extreme lifelong anxiety has left him traumatized and disabled..." Dr. Cromer adds: "His level of anxiety is highest at night. He generally finds himself to terrified to fall asleep, generally left to crash at 4 or 5 a.m." Dr. Cromer continues that this extraordinary anxiety has only served to heighten and prolong his depressive episodes, "frequently manifesting itself in thoughts of suicide." Cromer concludes: "He has virtually abandoned all normal activities"

Robert Krasnow struggles everyday of his life. At times, he has been overwhelmed by his illnesses and unable to function. At other times, he makes what for

him is a Herculean effort to get himself together and attempt to meet his most critical tasks. Currently, those include getting up and continuing to go for treatment, assisting a family member when in crisis, and occasionally sitting down with a case agent in Florida to continue to assist authorities. Over the last several months, there have been times when he has been just too sick and meetings have had to be rescheduled. If Mr. Krasnow suffered a heart attack, no one would question his inability to be present. Mr. Krasnow's mental illnesses are no less compelling. He knows there are consequences for his admitted wrongdoing. In many respects, his life over the past several years has been worse then any imprisonment could be. Still, he is in treatment and he has and continues to make post offense rehabilitative efforts. Against this backdrop, it is our hope that this Court and perhaps the Government will recognize that his conduct is born of the illnesses not willfulness.

Given the timeliness of Mr. Krasnow's efforts, his expansive truthful admissions, his successful assistance to authorities, his ongoing post rehabilitative efforts, and the overwhelming guilt and shame he feels for what he has done, a three level decrease for acceptance of responsibility has more than been earned.

Respectfully submitted,

Jeffrey B. Steinback

Jeffrey B. Steinback
53 W. Jackson Blvd.
Suite 1420
Chicago, IL 60411
(847) 624-9600

18

Lake City Auto Mall Briefs from Lake City Reporter Newspaper

March 11, 2004

State seeks $487,331 from car lot

Columbia lawsuits bring three judgments in excess of $35,000

By JUSTIN LANG jlang@lakecityreporter.com

The Florida Department of Revenue has filed a lien against Lake City Auto Mall for past due sales tax of nearly $500,000. And has had liens filed against it by the DOR in the past.

The dealership has also been ordered to pay local businesses $35,240 after judgments against it in Columbia County civil suits.

Complete story available in the THURSDAY edition of the Lake City Reporter.

March 13, 2004

Suzuki terminates franchise

Lake City Auto Mall loses affiliation with automaker

By JUSTIN LANG jlang@lakecityreporter.com

On Friday, California-based American Suzuki told the Lake City Reporter it has terminated its franchise with Lake City Auto Mall.

"They will no longer be a Suzuki dealer." said a spokeswoman for the motor corporation. "There's been a termination."

When contacted for further comment. Carol Snyder, another spokeswoman for American Suzuki, said "at this time we have an ongoing relationship with that dealer; therefore, we are just going to decline comment right now."

"If something changes in the status of that, we will give you a call," she added.

Exhibit C



**FAX TRANSMISSION**
**••TOWER ROAD OFFICE••**
7515 W. University Avenue
Gainesville, Florida 32607
352-333-9797
352-333-9840 (fax)

To:      Robert Krasnow
From:    Chris Brown
Subject: H C Healthcare, Inc.
Date:    March 15, 2004
Fax:     386-788-1985
Pages:   2

*If you did not receive all the pages indicated above, please tell CNB at 1(3)333-979?.*
MESSAGE:

### •••CONFIDENTIAL•••

Robert,

If you have any questions or need anything please call me.

Thank You,

Chris Brown
Commercial Loan Officer

"The information contained in this facsimile is confidential and for the use of the individuals or entity named above. If you are not the intended recipient of this facsimile or the employee or agent responsible for delivering it to the intended recipient, you are hereby notified that the dissemination, distribution or copying of this facsimile is strictly prohibited. If you have received this facsimile in error, please notify the sender immediately by telephone and destroy this document."

*Exhibit D*

**CNB**

DATE __Feb___ 2/ 2004

NUMBER ____

The Equal Credit Opportunity Act prohibits creditors from discriminating against credit applicants on the basis of race, color, religion, national origin, sex, marital status, age (provided that the applicant has the capacity to enter into a binding contract); because all or part of the applicant's income derives from any public assistance program; or because the applicant has in good faith exercised any right under the Consumer Credit Protection Act. The Federal Agency that administers compliance with this law concerning this creditor is:

**COMPTROLLER OF THE CURRENCY**
Consumer Activities Division
Washington, DC 20219

RECEIV'D
MAR 1 7 04

☑ This notice was delivered to the applicant personally.
☑ This notice was mailed to the applicant.

To __H C Healthcare, Inc.__

Our Application for (description of account, transaction or requested credit): __Commercial Revolving Line of Credit__

We have acted upon (description of adverse action taken): __Denied__

**PRINCIPAL REASON(S) FOR ADVERSE ACTION CONCERNING CREDIT:**

☐ Credit application incomplete
☐ Insufficient number of credit references provided
☐ Unacceptable type of credit references provided
☐ Unable to verify credit references
☐ Temporary or irregular employment
☐ Unable to verify employment
☐ Length of employment
☐ Income insufficient for amount of credit requested
☐ Excessive obligations in relation to income
☐ Unable to verify income
☐ Length of residence

☐ Temporary residence
☐ Unable to verify residence
☐ No credit file
☐ Limited credit experience
☐ Poor credit performance with us
☐ Delinquent past or present credit obligations with others
☐ Garnishment, attachment, foreclosure, repossession, collection action, or judgment
☐ Bankruptcy
☐ Value or type of collateral not sufficient
☐ Lack of established deposit relationship
☐ Slant or read due to limited or no time (creditors)
☑ Other, specify: _____

Additional information requested but information requested/y must be received within ___ days to complete this application. Failure to provide the information requested will result in no further consideration being given to the application.

By: _____

**DISCLOSURE OF USE OF INFORMATION OBTAINED FROM AN OUTSIDE SOURCE**

☐ Disclosure inapplicable.
☐ Our credit decision was based in whole or in part on information obtained in a report from the consumer reporting agency listed below.

Name: _____
Address: _____
Phone: _____

☐ Information obtained from an outside source other than a consumer reporting agency. Under the Fair Credit Reporting Act, you have the right to make a written request, within 60 days of receipt of this notice, for disclosure of the nature of the adverse information. If you have any questions regarding this notice, you should contact:

Creditor's Name: _____
Creditor's Address: _____
Creditor's Telephone: _____

TOTAL P.22

*Exhibit D*

## Martin M. Steed, M.D.

Board Certified in Psychiatry

5618 N W 43rd Street ◇ Gainesville, Florida 32653
Tel. (352) 377-8770 ◇ Fax (352) 371-3623

April 21, 2004

To Whom It May Concern,

RE: Robert Krasnow

Robert Krasnow has received treatment from me since April 5th, 2002. He recently successfully completed outpatient detox for alcohol dependence while under my care. I suggest that he undergo inpatient detox for his opiate dependence. Following this I suggest that he continue cognitive behavioral therapy for panic disorder.

Sincerely,

Martin M. Steed

MMS: mrm

Wellspring

Exhibit 6