UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

UNITED STATES OF AMERICA )
)                 No. 01 CR 22
v.                          )
)                 Judge Elaine E. Bucklo
)
)
ROBERT KRASNOW              )

**FILED**

MAY 0 5 2004

MICHAEL W. DOBBINS
CLERK, U.S. DISTRICT COURT

### NOTICE OF FILING

To:  Jeffery Steinback                    Daniel C. Murray
6323 N.W. 81st ST Blvd              55 E. Monroe, Suite 4100
Gainsville, FL 60603                Chicago, Illinois 60603

PLEASE TAKE NOTICE that on Tuesday, May 5, 2004, the undersigned
filed with the Clerk of this Court the following document in the above
captioned case: **GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM RE ROBERT
KRASNOW,** service of which is being made upon you.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

BY:   _Jacqueline Stern/ce_
JACQUELINE STERN
Assistant United States Attorney
219 South Dearborn - 5000
Chicago, Illinois 60604
(312) 353-5300

STATE OF ILLINOIS     )
)  SS
COUNTY OF COOK        )

Clara Long, being first duly sworn on oath deposes and says that she
is employed in the Office of the United States Attorney for the Northern
District of Illinois; and that on May 5, 2004 she caused the foregoing
Notice and the above-described motion to be facsimile and by hand-deliver
to the above-named individual(s) on said date.

_Clara_

SUBSCRIBED and SWORN to before me

this 5th day of May, 2004

_Peggy M. Zabinski_
NOTARY PUBLIC

"OFFICIAL SEAL"
Peggy M. Zabinski
Notary Public, State of Illinois
My Commission Exp. 06/04/2006

73

UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

**FILED**

MAY 05 2004

MICHAEL W DOBBINS
CLERK, U.S. DISTRICT COURT

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v. | ) No. 01 CR 22 |
| | ) Judge Elaine E. Bucklo |
| ROBERT KRASNOW | ) |

## GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM RE ROBERT KRASNOW

The UNITED STATES OF AMERICA, by PATRICK J. FITZGERALD, United States Attorney for the Northern District of Illinois, respectfully submits this supplemental sentencing memorandum concerning Robert Krasnow in order to address the following issues: (1) A four point enhancement should be imposed for leader/organizer (as opposed to a 3 point enhancement for supervisor); (2) The government objects to the defendant being given acceptance of responsibility; and (3) the government seeks restitution of approximately $6.6 million to be paid to Medicare/Medicaid.

### Background: The Offense Conduct

Defendant Krasnow is hoping that he has committed the perfect crime. Krasnow made at least $5.5 million from the scheme. Although he has repaid approximately $800,000, he has enjoyed the benefits of more than $4.5 million from the scheme. He has not repaid that money, and it is unlikely that he will ever repay that money, even if the Court enters judgments against him.

Having spent the proceeds of the crime, defendant Krasnow now hopes that he will walk away from the crime without spending any time in jail. If defendant Krasnow is able to keep $4.5 million of

73

criminal proceeds and avoid spending time in jail, he will have committed the perfect crime.

The defendant engaged in a massive fraud that began in 1985 and continued through 1998, thereby lasting for approximately 13 years. The fraud resulted in a loss to insurers that was far in excess of $10 million. The crime involved three separate health care facilities, namely, Doctors Hospital, the Desnick Eye Center, and Larkin Hospital. The fraud was carried out in two states, Illinois and Florida. The fraud involved hundreds and hundreds of patients, and dozens of doctors and administrators. The fraud at Doctors Hospital was so pervasive that the Hospital went into bankruptcy after the fraud was discovered by the government because the hospital could not operate without fraud.

The defendant was paid kickbacks, salary, and bonuses of more than $5,500,000 for his role in this scheme. Defendant Krasnow used doctors and patients to generate fees for the hospital and the eye center, and to generate money for Krasnow.

The defendant was responsible for finding dirty doctors who were willing to take kickbacks in exchange for admitting patients to Doctors Hospital. The defendant's goal in this scheme was to increase and maintain the number of patients being admitted to Doctors' Hospital. He accomplished that goal by paying kickbacks to doctors, who lied to patients, falsified medical records, and lied to insurers.

2

The defendant and the doctors used hundreds of patients as part of their scheme. Many of those patients had no idea that their doctors were lying to them in order to generate income for the hospital. The patients did not know that the doctors had a quota, that is, a certain number of patients that they had to admit to Doctors Hospital, in order to get paid their kickback fees. The patients did not know that Krasnow, who was paying the doctors, was paid bonuses as high as $50,000 a month, if he was able to get a large number of patient admissions. The patients did not know that their doctors were writing false information in the patients' medical records.

Five individuals from Doctors Hospital, including Krasnow, were charged with participating in the scheme, and pled guilty. That included three doctors and a patient recruiter. The doctors were Dr. Rao, Dr. Ravi Barnabas, and Dr. Monty McClellan. Those doctors each described the scheme in their plea agreements.

**Dr. Rao:** In his plea agreement, Dr. Rao admitted that he engaged in a massive fraud scheme with defendant Krasnow at Doctors Hospital. Dr. Rao admitted that he lied to patients in order to get the patients to agree to go to the hospital. Based on his agreement with Krasnow and others, Dr. Rao needed to admit a certain number of patients in order to get paid his kickback fee. Therefore, he lied to patients to convince them to be hospitalized. Specifically, Dr. Rao admitted that he engaged in the following

3

criminal conduct at Doctors Hospital:

Defendant Rao, Krasnow, Barnabas and others engaged in fraudulent conduct for the purpose of generating substantial revenues from Medicare, Medicaid, and private insurers, which included the following:

a. Defendant Rao caused approximately 1000 patients to be admitted to Doctors Hospital as part of this scheme. Approximately 90% of those patients did not need to be hospitalized.

b. Krasnow gave defendant Rao more than $100,000 in cash, most of which Dr. 1 provided to Krasnow so that Krasnow could give it to defendant Rao;

c. In or about June 1997, Doctors Hospital entered into a contract with defendant Rao's company, and paid defendant Rao approximately $16,666 each month so that defendant Rao could pay patient recruiters and patients. The contract was designed to conceal the fact that those monies were being paid in exchange for patient admissions;

d. Defendant Rao, Krasnow and others gave, and caused others to give kickbacks, incentives and benefits to certain individuals in order to induce them to refer and admit patients to Doctors Hospital;

e. Defendant Rao and others caused patients to be admitted to Doctors Hospital by giving the patients cash or

4

other benefits, by coaching patients to lie about their physical condition, by promising that the hospital stay would cost the patients nothing, and by telling certain patients that they needed to be hospitalized, even when there was no such need;

f. Defendant Rao, Krasnow, and Barnabas admitted and treated and caused others to admit and treat certain patients even though the patients did not have existing medical problems that required or justified such hospitalization or treatment;

g. Defendant Rao, Krasnow, and Barnabas concealed and caused others to conceal the scheme by creating false, fraudulent, and fictitious medical, clinical and business records;

h. From approximately the end of 1996 through May 1997, defendant Rao paid a doctor kickbacks of approximately $4000 a month, in cash, so that the doctor would allow defendant Rao to provide, and bill for, anesthesia services for surgeries performed by that doctor and his associates.

i. Defendant Rao, Krasnow, and Barnabas submitted and caused others to submit fraudulent bills to Medicare, Medicaid and other health care insurers, which included charges based on false diagnoses and for medically unnecessary services and tests. In total this scheme caused a loss to Medicare,

5

Medicaid and private insurers of more than $6 million.
See Rao's Plea Agreement, at p. 9-11.

**Dr. Ravi Barnabas:** Dr. Barnabas admitted similar conduct in his plea agreement, which included the following:

> Dr. Barnabas: (1)...received money and other benefits in exchange for patient admissions; (2) Caused numerous patients to be admitted who did not need to be admitted in order to increase the admissions; (3) Caused false entries to be made in certain medical records, which included exaggerating the patients' symptoms; (4) Caused certain medically unnecessary tests to be performed such as x-rays and blood tests; (5) Caused the waiver of co-payments and deductibles; [and] (6) Caused false bills to be submitted to various insurers.

See Barnabas's Plea Agreement, at p. 12.

**Dr. Monty McClellan and Doctors Hospital:** McClellan also admitted to engaging in a massive fraud scheme with Krasnow at Doctors Hospital. Specifically, in his plea agreement McClellan stated that:

> In or about September, 1993, Doctor's Hospital opened a medical/surgical unit known as the Two South Unit. Defendant McClellan became the attending physician for the Two South Unit. Defendant Krasnow was an administrator at Doctor's Hospital.
>
> In or about August, 1993, defendant Krasnow indicated

6

that he wanted defendant McClellan to admit certain chemically dependant patients into Doctor's Hospital for medical problems. Defendant Krasnow indicated that he wanted defendant McClellan to admit 20 to 25 patients a week to Doctor's Hospital. McClellan agreed to do so.

From in or about October 1993 through July 1994, defendant McClellan admitted approximately 100 patients a month from the Wellness Center into Doctor's Hospital. Most of those admissions were to the Two South Unit.

Defendant McClellan knew that at least 80% of the patients he admitted to the Two South Unit did not need to be admitted to the hospital for medical reasons. Defendant McClellan knew that the admissions were medically unnecessary because any existing medical problems were not of a nature that required hospitalization. Defendant McClellan believed that the patients should have been treated on an outpatient basis for any existing problems. To the extent that the patients complained of certain symptoms, defendant McClellan believed that those symptoms did not justify the hospital admission.

See McClellan's Plea Agreement, at pp. 5-7.

**Dr. McClellan and Desnick Eye Center:** Dr. McClellan also admitted engaging in a fraud scheme with Krasnow at the Desnick Eye Center. They used elderly patients at the Desnick Eye Center to

7

generate money through unnecessary allergy testing. McClellan stated the following:

> While working at the Desnick Eye Center defendant McClellan fraudulently ordered unnecessary allergy tests, which resulted in payments by Medicare exceeding $500,000.

> While working at the Desnick Eye Center defendant McClellan ordered hundreds of unnecessary RAST allergy tests, (radioallergosobent allergy tests known as "RAST" allergy tests) for patients who were at the Desnick Eye Center for eye surgery, knowing that those tests were not medically necessary or medically justified based on the patients' physical condition.

> During 1992 and 1993, defendant McClellan received illegal payments from an defendant Krasnow totaling approximately $11,300. Defendant McClellan and defendant Krasnow agreed that defendant McClellan would order RAST allergy tests for patients at the Desnick Eye Center in exchange for the illegal payments, with the understanding that blood from Desnick Eye Center patients would be submitted to a particular laboratory (hereinafter referred to as "Lab 1") for allergy testing. Defendant Krasnow and defendant McClellan agreed that the illegal payments would be paid in cash in order to conceal the payments.

> Defendant McClellan knew that Medicare paid Lab 1 more

8

than $1000 for each allergy test that was performed. Defendant Krasnow indicated that someone from Lab 1 (hereinafter referred to as Individual C) was paying him a $100 for every allergy test that was submitted by the Desnick Eye Center to Lab 1.

Defendant McClellan knew that the patients did not have symptoms or complaints that justified, supported, or required ordering RAST allergy tests. Defendant McClellan wrote certain information in the patient's medical records in order to justify ordering the allergy tests. Defendant McClellan told defendant Krasnow that he would justify the RAST allergy test by documenting a medical diagnosis in the medical records.

Defendant Krasnow and Individual C indicated that there would be approximately 10 to 20 patients a day who would be eligible for RAST allergy testing, and, defendant McClellan ordered allergy tests for approximately that number of patients. Defendant McClellan ordered two or three RAST allergy tests for some patients, knowing that those patients did not need those tests.

See McClellan's Plea Agreement, at p. 3-4.

**Defendant Krasnow:** Defendant Krasnow also admitted in his plea agreement that he engaged in a huge fraud scheme. He admitted the following:

Defendant Krasnow paid cash kickbacks to Dr. 2 in order to generate patient admissions. Dr. 2 used that cash to pay

9

patients and patient recruiters.

Defendant Krasnow and others provided sham contracts to certain doctors, including Dr. 2 and Dr. McClellan, in order to pay those doctors for patient admissions.

Defendant Krasnow was paid salary and bonuses totaling approximately $5 million because he increased and maintained the patient census in the hospital.

The scheme and relevant conduct, including conduct at Larkin Hospital, resulted in a loss exceeding $10 million.

Defendant Krasnow and Dr. 2, together with Doctors Hospital, acting through its agents, representatives, and employees (hereinafter all references to Doctors Hospital include its agents, representatives, and employees), and Dr. 1, Dr. McClellan, and Individuals 1, 2, and 3, and others engaged in fraudulent conduct for the purpose of generating substantial revenues from Medicare, Medicaid, and private insurers, which included the following:

a. Giving and causing others to give kickbacks, incentives and benefits to certain doctors and other individuals in order to induce them to refer and admit patients to Doctors Hospital;

b. Causing patients to be admitted to Doctors Hospital by giving the patients cash or other benefits, by coaching patients to lie about their physical condition, by promising that the hospital stay would cost the patients nothing, and by

telling certain patients that they needed to be hospitalized, even when there was no such need;

c.    Admitting and treating and causing others to admit and treat certain patients even though the patients did not have existing medical problems that required or justified such hospitalization or treatment;

d.    Concealing and attempting to conceal the scheme by creating false, fraudulent, and fictitious medical, clinical and business records; and

e.    Submitting and causing others to submit fraudulent bills to Medicare, Medicaid and other health care insurers, which included charges based on false diagnoses and for medically unnecessary services and tests.    In total this scheme caused a loss to Medicare, Medicaid and private insurers of more than $10 million.

See Krasnow's Plea Agreement, at pp. 4-5.

Dr. Rao tape recorded defendant Krasnow in March 1998.    During that conversation, Krasnow admitted paying kickbacks to Dr. Rao. That conversation included the following:

| | |
|---|---|
| KRASNOW: | Close the door.    (PAUSE) |
| KRASNOW: | (UI) I gave you, I gave you over $300,000 in cash (UI). |
| DR. VAVILIKOLANU: | You gave me 10...Bob... |
| KRASNOW: | Over (UI). |
| DR. VAVILIKOLANU: | Come here. |
| KRASNOW: | (UI) the last fuckin' 3 years whatever it's |

| | |
|---|---|
| | been.  I gave you over 300,000 in cash plus what we've given you here.  Do you know what you're fuckin' patients brought us?  Shit compared (UI). |
| DR. VAVILIKOLANU: | No, no, no Bob. |
| KRASNOW: | Shit.  Half of the fuckin' patients that came... |
| DR. VAVILIKOLANU: | Bob, Bob, Bob... |
| KRASNOW: | ...(UI) half of the fuckin' patients.  Why did you tell the guy I'm pocketing that money for?[1] |
| DR. VAVILIKOLANU: | What!  Look, let's talk outside (UI). |
| KRASNOW: | Can't go outside. |
| DR. VAVILIKOLANU: | Why not? |
| KRASNOW: | (UI) |
| DR. VAVILIKOLANU: | Look it man. |
| KRASNOW: | I can't go. |
| DR. VAVILIKOLANU: | Huh.  Listen, let me tell you he called me. I was, I had a cath, I was in my bed. |
| KRASNOW: | (UI). |
| DR. VAVILIKOLANU: | People, people told me,... |
| KRASNOW: | Talk quiet. |
| DR. VAVILIKOLANU: | Huh? |
| KRASNOW: | Talk quiet.  Talk quiet. |
| DR. VAVILIKOLANU: | People told me that you quit and I was, I was shitting my pants what the hell (UI). |
| KRASNOW: | Why you tell this motherfucker I (UI) cocksucker. |
| DR. VAVILIKOLANU: | Let me tell you... |

---

[1] This appears to refer to the fact that Krasnow was supposed to pay Dr. Rao

KRASNOW:                 Do you know how much in the first, in the
                         beginning you know how much of that money that
                         I took out of my pocket to give you out of
                         that over $300,000.

DR. VAVILIKOLANU:        How much?

KRASNOW:                 Over $150,000 was mine that he never fuckin'
                         reimbursed me.  Not a fuckin' dime.

DR. VAVILIKOLANU:        Bob, Bob,...

KRASNOW:                 Okay.

DR. VAVILIKOLANU:        ...he's, he's using me as a scapegoat.  I'm
                         telling you you gotta believe me.  You got, we
                         gotta talk man.  This is bullshit you know.
                         He's using you, me as a scapegoat.

KRASNOW:                 A 150,000 of that money $250,000 that I gave
                         you from the beginning was my money.  My
                         fuckin' money.  (UI).

DR. VAVILIKOLANU:        For how many admissions?  Thirty admissions?

KRASNOW:                 (UI) no, I gave it to you out of my pocket.
                         Out of my fuckin' pocket he never paid me
                         before you went on that payroll.

DR. VAVILIKOLANU:        He never paid you?

KRASNOW:                 Never.

DR. VAVILIKOLANU:        Why?

KRASNOW:                 Never.

DR. VAVILIKOLANU:        He said he was...listen, let me tell you, he
                         wanted me to give 40 commercial[] [patients]
                         ...

KRASNOW:                 (UI) 40 commercials.  I'm not going to jail
                         for nobody.  Nobody.

DR. VAVILIKOLANU:        Bob,...

KRASNOW:                 I'll get yoou an increase on your contract
                         that's it.

DR. VAVILIKOLANU:        ...w-, w-,...(UI) listen, Bob, listen to me.

| KRASNOW: | No I'm not goin' to fuckin' jail for nobody. |
| --- | --- |
| DR. VAVILIKOLANU: | (UI) Bob three years we did admissions. Nothing happened. Don't worry about it man. |
| KRASNOW: | That man is under tremendous fucking investigation. Do you understand that? |
| DR. VAVILIKOLANU: | So what, we are. |
| KRASNOW: | Tremendous investigation. |
| DR. VAVILIKOLANU: | Bob for 3 years we are up to the neck here (UI). |
| KRASNOW: | Tremendous investigation. Okay. Don't fuckin' jeopardize your family and yourself for this motherfucker for your 40 admissions. |

*  *  *

Krasnow orchestrated and participated in a multi-million dollar fraud scheme. Krasnow should not be allowed to walk away from the crime.

Krasnow was one of the top people at Doctors Hospital; he was the second-in-command there in many ways. The government believes that Krasnow's sentencing will have a strong impact on the health care community, and that other health care providers who may be motivated to cheat insurers and patients will take Krasnow's sentence into consideration in making their own choices.

### Leader/Organizer

A 4-level enhancement should be applied based on defendant Krasnow's role in the offense as a leader and organizer, in a scheme involving more than 5 participants. The defendant was a leader and organizer in that he directed and recruited other individuals. Indeed, the PSR concluded that Krasnow "recruited and

14

supervised" doctors and patient recruiters in the fraud scheme, and that the scheme involved more than 5 people.

The Pre-Sentence Report (PSR) recommended that the Court impose a 3-level enhancement for supervisor, instead of Leader/Organizer. The government previously filed a motion objecting to that determination, and arguing that the Court should impose a 4-level enhancement, rather than the 3-level enhancement recommended by the PSR. The government once again makes that motion, and incorporates the prior motion herein.

The defendant stipulated in his plea agreement that a 4-level enhancement for leader/organizer is applicable. Thus, the defendant cannot object to the imposition of a 4-level enhancement without breaching the plea agreement. The defendant has also waived his right to appeal this issue.

A 4-level enhancement is appropriate because the defendant directed the actions of Dr. Rao, Dr. Ravi Barnabas, and Dr. Monty McClellan, as well as the actions of certain patient recruiters[2]. The defendant organized the scheme, which involved obtaining patients to increase the hospital census, paying kickbacks to doctors in exchange for patient admissions, creating sham contracts to provide a means of paying kickbacks, and paying patient recruiters to find patients to be admitted into the hospital.

---

[2]There is no dispute that there were more than 5 participants in the scheme, and that the scheme was also otherwise extensive. The defendant made use of the services of innocent third parties, including secretaries, doctors, nurses, and hospital staff. "The guidelines recognize that a crime where the principals use "the unknowing service of many outsiders" may be found to be extensive under 3B1.1(a), application note 2." See U.S. v. Miller, 962 F.2d 739, 745 (7th Cir. 1992).

Dr. McClellan stated in his plea agreement that defendant Krasnow directed him to continue admitting patients to the Two South unit for medical problems, including chest pains, stomach pains, or respiratory problems, so that Medicaid and other insurers would reimburse the hospital. Defendant Krasnow also told Dr. McClellan to discharge certain patients for financial reasons, because the patients had been in the hospital too long and were costing the hospital money. Defendant McClellan ordinarily discharged the patients when defendant Krasnow told him to do so.

Dr. McClellan also stated in his plea agreement that defendant Krasnow ordered that other patients should continue to be hospitalized for financial reasons. Based on Krasnow's directions, Dr. McClellan fraudulently found a reason to keep certain patients hospitalized when defendant Krasnow told Dr. McClellan to do so.

An individual who was the CEO at Doctors Hospital during a substantial portion of the scheme provided information concerning defendant Krasnow's role as a leader organizer. According to the CEO, defendant Krasnow told the CEO to give Dr. Rao a contract and to pay Dr. Rao $7,000 a month. Defendant Krasnow told the CEO to terminate another doctor's contract because that doctor was not admitting enough patients. Defendant Krasnow told the CEO to terminate Dr. Barnabas' contract because Dr. Barnabas was not admitting enough patients. At an earlier date, when the CEO initially wanted to terminate Dr. Barnabas, defendant Krasnow said that the CEO could not fire Dr. Barnabas because Dr. Barnabas

16

brought a lot of patients to the hospital. Even if defendant Krasnow was carrying out decisions made by the hospital owner, he was clearly organizing the scheme.

According to the CEO, defendant Krasnow directed case managers and social workers to send patients to specific nursing homes. Other employees at Doctors Hospital also indicated that defendant Krasnow instructed them to send patients to specific nursing homes. Defendant Krasnow has admitted that he directed the hospital staff to send patients to specific nursing homes. Krasnow sent those patients to the selected nursing homes in exchange for those nursing homes sending patient to Doctors Hospital. According to Krasnow there were approximately 10 nursing homes on the South Side that sent patients to Doctors Hospital[3]. In exchange for the nursing homes sending patients to the hospital, Doctors Hospital referred patients to the nursing homes. Defendant Krasnow met with some of the nursing home owners and administrators. There were occasions when nursing home owners stated that they would not send patients to the hospital because the hospital had not sent them patients. Defendant Krasnow told Social Services that they should send patients to certain nursing homes who had sent patients to the hospital.

Defendant Krasnow was making decisions concerning nursing homes that impacted on sick and elderly people, and his decisions were based on financial interests, rather than being based on the

---

[3]    According to the CEO, Krasnow was also able to get certain doctors appointed as medical directors at nursing homes.

17

best interests of the patients. Defendant Krasnow was clearly acting as a leader and organizer when he directed the hospital staff to send patients to a specific nursing home, based on his desire to have the nursing homes send patients to the hospital. hospital.

Another executive at the hospital also provided information about defendant Krasnow's role as a leader/organizer. That executive said that defendant Krasnow put pressure on various doctors to get more admissions. He stated that he heard Krasnow shout at doctors to provide more admissions into the hospital, which included shouting at Dr. Rao and Dr. McClellan about getting more admissions.

Defendant Krasnow also admitted that he contacted various doctors and directed them to increase the number of patients that they were admitting. Krasnow directed Dr. Monty McClellan and Rao to increase the number of admissions to the hospital[4].

According to the CEO and the other executive, Krasnow was responsible for staffing the Wellness Center. Both executives also

---

[4] As stated in the government's prior motion on this issue, Krasnow was responsible for hiring two employees who participated in the scheme. Krasnow directed those employees to go to shelters and churches where there were alcoholics or addicts and recruit patients from those locations. They were paid a salary and a discretionary bonus based on the number of patients that were admitted. Although the head of the hospital had to approve their bonuses, Krasnow was the one who evaluated whether those two employees would get a bonus. Krasnow also put another individual on the payroll, who acted as a driver for Dr. Barnabas. Krasnow set up that arrangement as a benefit for Barnabas in exchange for patient admissions. There was also a physician's assistant at Doctor's Hospital, who worked with Dr. McClellan. At some point, the physician's assistant refused to support the false entries that McClellan was making concerning the patients' medical histories and physical exams. Krasnow intervened and directed the physician's assistant to support McClellan and do what McClellan said.

said that Krasnow was responsible for forcing the CEO out of the hospital for a period of time.

Defendant Krasnow also recruited, directed, and paid Dr. McClellan to order unnecessary allergy testing at the Desnick Eye Center. Defendant Krasnow was clearly the organizer of that portion of the scheme, which resulted in defendant Krasnow being paid large amounts of money by the lab owner, who was performing the allergy testing.

In sum, defendant Krasnow organized the criminal activity involved in maintaining and increasing the number of patients admitted to the hospital. Defendant Krasnow was the hands-on driving force behind the patient admissions and the payments of the kickbacks. He recruited and directed members of the scheme, and he received a substantial portion of the proceeds (more than $5 million). Therefore, defendant Krasnow should be considered a leader/organizer, and a 4 point enhancement should be applied.

### Acceptance of Responsibility

Krasnow has acted in a manner that is inconsistent with acceptance of responsibility. Krasnow spent more than $4 million that he took home from this crime. The government, the Court, and the Probation office have no idea how Krasnow spent that money because Krasnow will not provide that information. Krasnow wants to keep the money from the fraud, and walk away without going to jail. Krasnow hopes to prove that crime really does pay.

Krasnow has talked a blue streak about the criminal conduct

19

that he engaged in, and the list of his crimes is lengthy. Krasnow, however, has not taken steps to right that wrong by repaying the money that Krasnow took out of the scheme. Krasnow hope to have the best of all worlds--keep the money and go home without going to jail.

Krasnow knew in at least March 1998 that he was under investigation. At that point, Krasnow was still working at Doctors Hospital and he was earning money hand over fist. Krasnow left Doctors Hospital in approximately September 1998, and Krasnow began cooperating with the government in January 1999. Krasnow earned got paid approximately $5 million at Doctors Hospital between approximately 1991 and 1998. He earned approximately $700,000 from kickbacks prior to that time.

When Krasnow started cooperating in January 1998, he knew that he had received illegal proceeds and that he would have to pay money to the government and the victims of the crime. Krasnow still has plenty of money at that point, and if he had truly accepted responsibility for his crime, he would have taken steps to pay his victims, or to preserve his funds for payment at sentencing. Krasnow did none of that. Instead, he continued to live a lavish life style, using proceeds from the fraud. Krasnow lives in a large and beautiful home, with a swimming pool, that is worth over half a million dollars. Krasnow drives a Lexus.

Krasnow entered into a plea agreement before this Court in 2001. Krasnow still had money at that point, and he promised to

pay a portion of his fraud proceeds as forfeiture. Specifically, in the plea agreement Krasnow promised to pay $3 million in forfeiture. Krasnow failed to keep that promise. Although Krasnow paid $800,000, he failed to pay $2.2 million.

Now, five years after Krasnow discovered he was being investigated, and after Krasnow has spent and disbursed the proceeds from the fraud, Krasnow claims he simply cannot pay. In fact, Krasnow cannot pay because he spent the millions for his own pleasure and benefit, and the pleasure and benefit of his family.

If Krasnow had truly accepted responsibility, he would have tried to earn money to live up to his commitment of repaying $3 million. But Krasnow did not do that. Instead, Krasnow essentially stopped working in 1998. Even when Krasnow did do some work, he did not send money to the government to pay for the forfeiture. Krasnow felt free to spend $2000 a month on groceries, but he could not send $100 a month towards the forfeiture.

Moreover, there has never been an answer to the question: "Where did all the money go?" Krasnow has consistently refused to provide an answer to that question, and has refused to provide documents that show what happened to the money. This complete resistance to disclose financial records shows a failure to accept responsibility. Krasnow wants the Court to accept his unsupported word that he simply cannot pay the forfeiture, and it's not his fault that he does not have the money to pay.

One of the factors that the Court can consider in determining

21

whether the defendant accepted responsibility is the defendant's "voluntary assistance to authorities in the recovery of the fruits" of the offense. See U.S.S.G. § 3E1.1, Note (e). In this instance, Krasnow kept the fruits of the offense for himself and his family.

Krasnow has not taken financial responsibility for the crime, which means he has not taken responsibility. The driving force behind the crime was to make money, and Krasnow made lots of money. He made money by using other people's blood for unnecessary lab tests, and by paying kickbacks to doctors who lied to patients. He made more money than many people see in a lifetime. Indeed, a person who earns $100,000 a year would have to work 50 years to make the $5 million that Krasnow made from the fraud scheme at Doctors Hospital. But Krasnow has not been willing to give up the money that he made from the fraud.

The defendant promised to pay $3 million in forfeiture, which was a reasonable amount, given the fact that the defendant made in excess of $5 million while participating in the fraud scheme at Doctors Hospital, and given the fact that he made hundreds of thousands of dollars while participating in the fraud scheme at the Desnick Eye Center.

Pursuant to Paragraph 23 of the plea agreement, the defendant promised to pay forfeiture of $600,000 in 2001, $600,000 in 2002, $1 million in 2003, and $800,000 in 2004. Specifically, the defendant promised to pay the following amounts of money on or before the following dates:

| 1st Payment | $300,000 | March 15, 2001 |
| 2nd Payment | $300,000 | September 15, 2001 |
| 3rd payment | $300,000 | March 15, 2002 |
| 4th payment | $300,000 | September 15, 2002 |
| 5th payment | $500,000 | March 15, 2003 |
| 6th payment | $500,000 | September 15, 2003 |
| 7th payment | $800,000 | March 15, 2004 |

Total:    $3,000,000

As of this date, Krasnow has made the following payments:

| 1st Payment | $300,000 | | March 22, 2001 |
| 2nd Payment | $300,000 | | September 14, 2001 |
| 3rd payment | $0 | | March 15, 2002 |
| 4th payment | $0 | | September 15, 2002 |
| 5th payment | $210,000 | ($ 50,000 May 20, 2003) ($ 25,000 June 7, 2003) ($135,000 July 30, 2003) | May-July, 2003 |
| 6th payment | $0 | | September 15, 2003 |
| 7th payment | $0 | | March 15, 2004 |

Total:    $810,000

Although Krasnow made the first two payments as promised, when the third payment of $300,000 came due in March 2002, Krasnow failed to make that payment. Krasnow also failed to pay the $300,000 that was due in September 2002 and the $500,000 that was due in March 2003.

Krasnow made no payments towards forfeiture during the year 2002. Between September 2001 and May 2003--for a period of 19 months--Krasnow did not pay even $100 towards forfeiture. Throughout that time period, the government repeatedly stated that the government viewed the failure to make forfeiture payments as a material breach of the plea agreement, and that the government

23

considered the payment of the forfeiture as part of Krasnow's continued cooperation. The government also made it clear that failure to comply with the terms of the plea agreement could have serious consequences for the defendant.

In approximately April 2003, based on Krasnow's request, the government stated that it would consider renegotiating the dates for the payment of forfeiture if Krasnow paid $600,000 by May 10, 2003, thereby covering the payments that were due for the year 2002.

The government was advised that Krasnow was going to sell his home which had a value of more than $500,000 to a buyer. The government was advised that Krasnow's children or a friend might buy the house. The government was also advised that money might be generated through a car dealership that was owned by Krasnow's daughter. The government repeated its position that failure to pay the forfeiture constituted a material breach of the plea agreement, and that the payment of the forfeiture was part of Krasnow's continued cooperation.

The government stated that $600,000 would have to be paid no later than May 10, 2003. No funds were paid before May 10, 2003. Krasnow paid approximately $210,000 between May 20 and July 30, 2003, thereby paying far less than half of the monies due for the year 2002. Krasnow did not sell his house, and still lives in that house today.

Krasnow also failed to make the first payment due in 2003, of

$500,000. The second payment of $500,000 was due in September 2003, but Krasnow failed to pay those monies. A review of the payments shows that Krasnow failed to make a good faith attempt to pay the promised forfeiture. Krasnow's decision to spend the money and refuse to account for where it went should have consequences because it continues the pattern of fraud that Krasnow started in 1985. Krasnow should not be given acceptance of responsibility.

### Restitution

Defendant Krasnow admitted in his plea agreement that there were at least seven doctors were involved in this fraud. Specifically, defendant Krasnow stated that:

> At least 5 doctors, besides Dr. Rao and Dr. McClellan, were given money or other things of value in exchange for admitting patients to the hospital. Dr. 1 and defendant Krasnow arranged for those doctors to have contracts, under which the doctors were paid, but did very little work in exchange for the money. In fact, the doctors were actually being paid for patient admissions. The doctors had to admit a substantial number of patients each month in order to keep the contracts.

See Krasnow's Plea Agreement, at p. 5.

Defendant Krasnow described the extent of the scheme during an interview on August 18, 1999. Defendant Krasnow said that the average admission resulted in the hospital being paid approximately $3000 for each patient.

Defendant Krasnow stated that he believed that Dr. Rao and Dr. Barnabas, together, had approximately 720 medically unnecessary admissions. At $3000 for each admission, the loss for that doctor was approximately $2,160,000.

Defendant Krasnow also identified the loss relating to three other doctors who were paid substantial kickbacks for patient admissions. According to defendant Krasnow, almost all of their patients were covered by Medicare or Medicaid, which prohibit the payment of kickbacks. Medicare and Medicaid will not pay for any services arising from or relating to kickbacks. According to Krasnow, those doctors, together, had approximately 5820 admissions. At $3000 for each admission, the loss for those doctors is approximately $17,460,000. Therefore the total loss for Dr. Rao and the other three doctors is approximately $19,620,000.

Dr. James Desnick paid $13 million in a civil settlement with the Department of Justice relating to Doctors Hospital. He did not pay the full amount of the loss. Therefore, the government respectfully requests that the Court order defendant Krasnow to pay restitution to Medicare and Medicaid of approximately $6,620,000.

## CONCLUSION

The government respectfully requests that the Court take the following actions: (1) Impose a 4-level enhancement because the defendant was a leader and organizer in a scheme involving more than 5 participants; (2) Deny a reduction in the sentence for acceptance of responsibility; (3) Order restitution of approximately $6,620,000 to be paid to Medicare/Medicaid.

Respectfully submitted,

PATRICK J. FITZGERALD
United States Attorney

By: _____
JACQUELINE STERN
Assistant U.S. Attorney
219 South Dearborn, 5th Floor
Chicago, Illinois 60604
(312) 353-5329