UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA | ) |
| | ) |
| v | ) No 01-CR-22-1 |
| | ) |
| ROBERT KRASNOW | ) Honorable Elaine E. Bucklo, |
| | ) Judge Presiding |
| | ) |
| Defendant, | ) |
| | ) |

**DEFENDANT, ROBERT KRASNOW'S RESPONSE TO GOVERNMENT'S SUPPLEMENTAL SENTENCING MEMORANDUM AND GOVERNMENT'S REPLY TO HIS MOTIONS RELATING TO SENTENCING**

## I. INTRODUCTION

Fifty-Two year old, Robert Krasnow pled guilty to two counts of an Information pursuant to a plea agreement that had been executed by both parties before the charge was ever filed. The plea agreement called for Mr. Krasnow's ongoing cooperation. This Honorable Court accepted Mr. Krasnow's plea of guilty on February 2, 2001, finding that he, under oath, had provided an extensive factual basis to support his plea. In his plea agreement, Mr. Krasnow also stipulated to additional relevant conduct. The Pre-Sentence Report reveals a further additional verbal acknowledgment by Mr. Krasnow of his participation in the offense, as well as genuine expressions of contrition, indicating "how sorry he was for what he did" and stating "that he would never do anything like this ever again."

Over a four-year period, Mr. Krasnow also spent countless hours in literally dozens of debriefings, providing truthful admissions to the Government. During these debriefings, Mr. Krasnow experienced something of a catharsis in explaining all he knew about the present investigation to authorities. The Government characterized Mr. Krasnow's efforts in glowing terms. So forthcoming was Mr. Krasnow, they observed, that the information just "poured out of him." Mr. Krasnow was favorably compared to other Government witnesses, with whom it was working.

Mr. Krasnow agreed to pay a forfeiture to the Government in the amount of $3 million dollars. He bit off more than he could chew. Businesses he believed could generate significant income have failed. Illness precluded him from working. His savings are gone. He is dependent on his son for everything. He has just forgone his last remaining substantial asset, his home, having borrowed as much as he could on it and then quit claimed the balance of the equity to the Government. The Government now has collected approximately $1.3 million dollars from him.

Finally, Mr. Krasnow timely notified the Government of his intent to plead guilty, a full two years before he was ever even officially charged. The Government asks, nonetheless, that this Honorable Court deny to him the adjustment for acceptance of responsibility.

## II.  ACCEPTANCE OF RESPONSIBILITY

In our somewhat lengthy memorandum in support of the Probation Department's proposed downward adjustment for acceptance of responsibility, we specifically discuss in detail four separate provisions in the Application Notes of the Commentary to this Guideline provision. (See May 5th Defense Memorandum) Those provisions concern timeliness, truthful admissions, assistance to authorities in recovering the fruits of the offense and post-offense rehabilitative efforts.

The very first consideration in the Application Notes to guideline section 3E1.1 concerns a defendant's "truthfully admitting conduct comprising the offense of conviction, and truthfully admitting or not falsely denying any additional relevant conduct for which the defendant is accountable..." It is true, as pointed out by the Government that Mr. Krasnow has cooperated extensively with authorities in its investigation and prosecution of criminal activities by other individuals. That extensive cooperation, however, is not the basis on which either the Pre-Sentence Report or the defense propose this reduction be based. Certainly, Mr. Krasnow's sustained efforts in assisting the Government were and continue to remain significant. However, it is Mr. Krasnow's expansive, truthful admissions to the Government, comprising not only his two counts of conviction but also the additional relevant conduct, which are at issue here. Mr. Krasnow's statements to the authorities not only assisted in the investigation or prosecution of others, but of his own misconduct. Again and again over a four-year period, during Government debriefings, during the colloquy between Mr. Krasnow and this Court when he pled guilty and during his interviews with the Probation Department,

Mr. Krasnow repeated these truthful admissions. Mr. Krasnow, then, has unquestionably satisfied this criteria for the acceptance reduction to be given.

The Government's May 10th Reply also overlooks the important role Mr. Krasnow assumed in assisting the Government in their recovery of $14 million dollars from Dr. James Desnick. The Government acknowledges in its Official Version of Events on Page 14 that Desnick's payment of $14 million dollars in a civil settlement was based in part on Krasnow's cooperation. Given that the loss amount in this case is between $10 and $20 million dollars, Krasnow's efforts were extremely significant in helping to recover the proceeds of this offense.

Also overlooked in the Government's May 10th Reply is Mr. Krasnow's substantial cooperation with prosecutors and agents in Florida concerning Larkin Hospital and other health care providers. This ongoing effort specifically concerns the recovery of monies by the Government through its pursuit of offenders under the False Claims Act. The Case Agent in charge of this investigation, Agent Wayne Russell, advised the Probation Department as follows: "Dr. #1 purchased Larkin Hospital and basically replicated the same health care fraud scheme that occurred in the Chicago area. According to Agent Russell the extent of the Larkin Hospital fraud scheme was not known to the Government until the defendant provided detailed information regarding the scheme. In fact, Agent Russell indicated that the relevant conduct for which the defendant is being held accountable in relation to Larkin Hospital in the instant case is based upon information from the defendant himself...He indicated that the civil case related to Larkin Hospital, Dr. #1 and the others, is currently in settlement negotiations; however should the matter go to trial, the defendant would likely be asked to testify." (PSR pages 28, 29 Lines 884-

889; 896-898) Agent Russell advised the undersigned that without Mr. Krasnow's assistance, "we would have no case and we wouldn't be recovering anything from anyone."

Rather than acknowledging Mr. Krasnow's enormous contribution to authorities in these recoveries, the Government instead chooses to focus on Mr. Krasnow's inability to pay his forfeiture obligation. Mr. Krasnow has now paid the Government in excess of $1 million dollars and pledged his last significant asset, his home, for a total of approximately $1.3 million dollars. Other than a four-year-old refinanced Lexus, furniture and some personal property, Robert Krasnow has nothing left.

Still, the Government wishes this Court to find fault in the way Mr. Krasnow previously spent or invested money he received and then use this to undo four years of efforts in this case.

The principle money Mr. Krasnow received came in a very large check he received from Dr. Desnick in the amount of $2,350,000.00, in September of 1997. That money was used to purchase his home which has now been quit claimed to the Government; the money was used in connection with a production company which failed; the money was used to assist his daughter in an automobile dealership which also failed; the money was used to pay back taxes; the money was used to pay doctor bills; money was given to a few charities; money was used to assist family members; The money was used to repay a portion of his forfeiture obligation. Bob Krasnow did not have the money in February 2001 to make the $3 million dollar forfeiture payment. He had hoped, with his help, that his daughter's automobile dealership might become profitable. Unfortunately, it did not. He had hoped that he would be able to find other employment which would have

5

generated money, unfortunately, his health did not permit. In any event, he requested and the Government agreed to extend the forfeiture payments over a two-year period to give him the opportunity to make these payments. Borrowing, selling personal property and quit claiming his home, Bob Krasnow managed $1.3 million dollars. The Government's May 10th Reply speaks in terms of disgorging. He has, in fact, been disgorged. That he tried to assist his family financially or salvage some things for his wife, like his home, may not merit him any special consideration; but it also should not undermine his candid admissions, timely plea, and significant assistance to the Government, even now, in pursuing other proceeds.

Finally, in this regard, are Mr. Krasnow's efforts at post-offense rehabilitation. In their May 10th Reply, the Government claims that we have "not pointed to anything constructive that he has done", although, at the same time, acknowledging that he "used painkillers to excess and has tried to stop using them." The Government overlooks the available information in the Pre-Sentence Report concerning Mr. Krasnow's efforts at overcoming his opiate dependency and his alcoholism.

Specifically, as stated in the Pre-Sentence Report, "In March 2003, the defendant began a detoxification program in Tampa Florida for his addiction to painkillers." This was after an evaluation by Dr. Cromer on February 21, 2003, which resulted in a diagnosis of Mr. Krasnow of "severe, chronic opiate dependence". Mr. Krasnow traveled from time to time to Tampa in an effort to break his opiate dependency.

This Court also has a recent letter from Mr. Krasnow's treating psychiatrist, Dr. Steed, appended as Exhibit G to our May 5th Memorandum regarding acceptance. As Mr. Krasnow decreased his use of painkillers, he resumed his consumption of alcohol, trying

to fill the void. Mr. Krasnow again turned to Dr. Steed, seeking help. And as Dr. Steed confirms in his most recent letter, " he recently successfully completed detox for alcohol dependence while under my care". Post-Offensive Rehabilitative efforts concern counseling or drug treatment. Mr. Krasnow has been in counseling for over two years. He has sought and received drug and alcohol treatment since at least February of 2003. We do not suggest that addiction in any way lessens the severity of this offense; but his ongoing rehabilitative efforts are at once constructive and precisely what was envisioned by application note 1(g) of the commentary to the guideline section 3E1.1.

### III. COOPERATION

The Government has indicated its intention to move for a downward departure for cooperation under section 5K1.1. The Government will recommend a sentence of imprisonment of two thirds of the low end of the applicable guideline range. (See Government's reply dated May 10, 2004) Under the terms of Paragraph 19 of the plea agreement, the defense, in turn, is free to address the Court at the time of sentencing on the issue of whether a further departure may be appropriate.

### IV. MENTAL AND EMOTIONAL HEALTH

We have submitted to this Court a motion for downward departure based on extraordinary mental and emotional difficulties suffered by Mr. Krasnow. Given the

Government's motion for downward departure pursuant to guideline section 5K1.1, the defense now intends to offer the mental and emotional health argument concerning Mr. Krasnow in mitigation at the time of sentencing. For now, we offer only that Mr. Krasnow does and has for some time suffered from certain severe mental illnesses. These health concerns are not offered to excuse Mr. Krasnow's admitted misconduct, but rather to help explain some of his conduct, both at the time of the offense and thereafter.

We do not suggest Mr. Krasnow was traumatized by the crime he committed, but rather the illnesses with which he suffers. Severe, chronic depression, post-traumatic stress syndrome and opiate dependence are serious illnesses. The Government has evidentially taken the post-traumatic stress disorder to be a function of the crime he committed. It is, instead, a function of much more fundamental anxiety, panic and stress disorders stemming from childhood abuse. One of Mr. Krasnow's daughters, Charissa, has written a letter to the Court in behalf of her father. (Appended to this response as defendant's Exhibit K) Perhaps this letter will provide some insights in this regard.

Mr. Krasnow should be afforded the same opportunities as any other individual who faces sentencing to be heard on the issue of his mental health as it may impact on a variety of sentencing decisions.

## V. RESTITUTION

Concerning restitution, the Pre-Sentence Report states as follows: "On May 22, 2003, Assistant United States Attorney Jacqueline Stern advised that she will seek joint

8

and several payment of restitution in the amount of $500,000 from the defendant and co-defendant Monty McClellan, based upon the unnecessary billing to Medicare for the allergy testing in which they were both involved. Additional restitution is not being sought, based upon the fact that in December, 2000, Dr. James Desnick paid $14 million dollars to the Government pursuant to the terms of his civil settlement." (See PSR page 10 lines 324-239)

Last week, the Government submitted its supplemental memorandum where it now seeks from Mr. Krasnow the amount of $5,620,000.00. The basis for this, according to the chart provided by the Government, is an August 18, 1999 phone conversation between Ms. Stern, Agent Ferguson and Mr. Krasnow, wherein, Mr. Krasnow, without the benefit of any records, offered certain rough, unaided estimates about the conduct of a number of different doctors.

Thereafter, the defense has had a very limited opportunity to evaluate this new Government position. Given that it represents an approximate 1100% increase, significant additional analysis must be undertaken in order to attempt to be prepared for a hearing on this issue.

Respectfully submitted,

Jeffrey B. Steinback

Jeffrey B. Steinback
53 W. Jackson Blvd.
Suite 1420
Chicago, IL 60411
(847) 624-9600

9

May 10th, 2004

To the Honorable Judge Elaine Bucklo,

My name is Charissa Krasnow. I am 24 years old and the daughter of Robert Krasnow, of whom this letter is pertaining to. I am grateful for the opportunity to be heard on behalf of my father's character. Writing this letter does not prove itself to be an easy task; it is impossible to capture the greatness of my father on a few pages. However, I will do the very best that I can.

For the twenty-four years I have been Robert Krasnow's daughter, I have been in awe of his life. My father possesses gifts that are intrinsic, they are blessings that I believe have been given to him by a higher power. He is effortlessly intelligent, naturally courageous, and constantly generous among other things. All of these qualities have made him a wonderful father, but even more so a natural born leader. He has the ability to motivate and inspire people who are desperate and hopeless. Through the eyes of a child, I noticed all of this very early on in life. People that he has helped still come to me and tell me what a wonderful man he is, how he has changed their lives and how blessed I am to be the daughter of such a man. It is true, I am blessed. The lessons my father has taught me has influenced all that I do; the good and not so good

One particular memory that prevails in my heart and mind is of an instance where my father helped a homeless couple when I was about seven. I remember driving home from the store on a very cold snowy Chicago day, and my father stopping to help an elderly couple that had no place to go. I was sitting in the backseat, and my father had offered them a motel for a few nights and a meal at the Sizzler restaurant. I remember thinking to myself that the couple smelled badly, and because of this I didn't want to sit very close to them. We all went to eat, and

it was obvious the couple was very hungry. My father ordered them both a steak meal and I sat back and listened to the conversation my father had with them. I could see the concern in my father's eyes as he spoke to them about their situation. The conversation was focused on how my father could help them to get back on their feet, and I will always remember how very grateful they were. After dinner, we dropped them off at a motel and they were so excited to have a nice place to sleep. My father told me to hug them good-bye, and although their smell was repulsive I did so with sincerity. On our way home I looked at my father as my hero. Over the course of a year we would hear from the couple. Eventually the man found a job and they found a place to stay. My mother and father gave them some furniture we no longer needed and they eventually became financially secure. He taught me a great lesson in life not only that day, but on many other occasions- because we have been blessed with so much it is our duty to give back. Not only should we give back with money, but we should give back by showing all people respect and dignity they reserve, regardless of their status in life. It is evident in my own life that I have applied these great lessons appropriately. I have recently been elected President of the National Honor Society of City College, which is mainly a community service organization. My blessings in life would not taste as sweet, if I did not help those in need.

Perhaps the greatest lesson I have ever learned from my father is that all things are possible. It sounds simple, but I am living proof of the statements veracity. About a year and a half ago, my father was about to get treatment for his drug problem. The night before he went into treatment, he sat me in a room told me he loved me, and will always support me regardless of any mistakes I may make in life and told me he knew I was hurting deeply. He then asked me while holding me tight if I had a drug problem. I confessed that I had been addicted to the pain-killer oxy-contin for over a year and that I was desperately in need of help. I was going through very bad withdrawals and was very sick. That night he promised me that I was going to be okay

and that he would get me treatment as soon as possible. When my father told me I was going to be okay, I deeply believed him. I had no strength left and he promised me that I now had all of his, and that he would do anything in his power to nurse me back to health. Because he saw his daughter in such a grave situation, he postponed his own treatment to get me the help I needed. Until I could go into the treatment center, my father was always at my side cleaning up my vomit and walking me around the room so that my legs didn't hurt so badly (a common side effect of opiate withdrawal). I knew that I had disappointed my father, but he never let me know this. I knew that out of everyone he understood my pain the most, and because he understands my pain, he understood how hard it was for me to recover. Without his support and lack of shame, I could not have achieved a year and a half sobriety. I now have an immense amount of strength and have reclaimed my own life. For this I thank God, my father, and my mother.

On the same token, I wish the same for my father. He has always been able to help others but not himself. His blessing of generosity is also a curse. People, including myself have leaned on my father for strength, all of his life. When I think of the life my father has lived thus far and how he had changed so many things around for his family and others, I am reassured once again that all things are possible. I am afraid that my father no longer sees it this way, and because of his drug addiction and stress he is losing the part of himself that has for so many years been a survivor of circumstance. My father once told me about a dream he has had for years. The dream is of a lion running with a pack of hyenas chasing it. Over the years the hyenas have gotten closer and closer to him trying to attack at once and drag him down. You don't need to be a psycho-analyst to figure out that the lion represents my father and his life. The hyenas in my opinion represent many things. One may represent his father who was very physically and verbally abusive, another, insecure parts of himself that always are present even when he has achieved something great, the obligation he has to his family to be a provider, his abusive relationship with Dr. Desnick which resembled the one he had with his father, he felt he had to prove himself in

order to win approval. Another is his drug addiction that, speaking from experience, haunts you constantly. A larger one is this case that frightens him immensely because he has no idea of the outcome. Another his health, of which he is afraid to know the true status of because it is so obviously fading. If the life of my father was to be portrayed in a book or movie, there would be no doubt that it would make for an exciting story. He has lived so many lives and has done so much good for others, but like all gifts from God, you can either use them to the best of your ability or stray from the righteous path and use them against yourself. Unfortunately, the righteous path in life is not always illuminated and my father has strayed from it somewhat. Because of his wrong doings, especially those in respect to his case, the entire family has suffered. It is hard for me to see my hero, my father charged with a legal offense, and it is hard for my entire family. It affects almost every part of the way we live. Most namely, the state of my father. He is in such dire need of medical help. He has a serious addiction to painkillers that seems to get worse as more and more stress from the case piles up. Because of the stress and his addiction he has lost so much weight that he now fits into some of my clothing (he used to weigh over 300 pounds). He rarely eats, stays up all night and sleeps all day. I recently had to call an ambulance to his house because he was unresponsive. I hate seeing my father this way. I feel as though he is nothing like he was five years ago. I can't remember the last time he left the house. Regardless he is still my hero, and I have hope that he will be able to continue to use his gifts in even more constructive ways. The aspect that I consider to be vital to his recovery is how he will be punished for the crime he has committed. First and foremost, his drug problem needs to be addressed. I know from experience that even a year of drug abuse is painfully difficult to recover from. My father, who has been using for most of his life will need extensive treatment. I believe that he has so many issues from childhood that need to be dealt with in order to deal with his pain, instead of concealing the hurt with drugs. He also needs to learn how to have hope for his own life and his families life. I am very afraid of the future of our family if he does not get help

quickly. I know that this is somewhat of a wake-up call to change his life, and in a way I am grateful. Although I would miss him immensely, it would be best for all of us if he gets proper treatment and counseling. My father believes in giving second chances to people, although he has yet to get a second chance from anyone else. Another way that the situation has influenced my family is that we have been struggling with money. I know how badly it hurts my father to see us go without, because he has done everything to make our lives better than his own. Numerous members of our family have had a struggle with drug addiction and psychiatric problems. This has caused my father tremendous stress and grief as well. I do not blame our downfall solely on his case, but I do attribute much of it to our inability to function without one another.

When my father was young he used to spend a lot of time at the library. The library was his escape from reality like drugs are for him today. His mind would wander from his severely abusive situation at home and read books that offered a better life. One of his strongest influences was Joe Kennedy, the way he raised his family to stick together, regardless of anything, was the vision he had for his own life. He wanted his children to be moral, charitable, educated people that understood the value of family and the power that came from the love and confidence nurtured within it. For the most part, we are very much like that. We have all strayed a bit, but throughout every hardship we have pulled through together and my father was the glue between us. He taught me how wrong it was to fight with my siblings because they would always be the only people I could truly count on for the rest of my life. Now, with my fathers gradual downfall, our family is like a horse without its head. We are still very close, but it as though our mentor is gone because all of those hyenas have finally dragged him down.

I am aware that many girls grow up thinking that their father is the greatest and that they could do no wrong. I am not implicating that at all. What I am saying is that I know that my father is capable of great things and also of immoral things. At the end of the day, I know my

father has done a tremendous deal of great things and a small amount of bad. I accept him for what and who he is. A man that can rise from nothing to become everything to so many. We all fall short of the glory, some more than others of course, but I know in my heart that my fathers purpose on life has yet to be completely fulfilled. I am not asking for an excuse for punishment for my father but I am respectfully asking that you read this letter with an open heart and mind. If you were to know my father on a personal level, I have no doubt that you would see the heart in him. He has grown more than anyone I have ever known or probably will now. I also feel that if you were to know him, you would believe in him. Thank you for your attention and willingness to read my letter.

With deepest respect,

*Charissa Krasnow*

Charissa Krasnow